Gregory F. DANIEL, M.D., Ian W. Cummings, M.D., John A. Timmons, M.D., Reed E. Paulson, M.D., Albert J. Romanosky, M.D., Bruce W. McNulty, M.D., On Behalf of Themselves and All Others Similarly Situated, Plaintiffs–Appellants,

Joseph L. Albright, Jr., M.D., Lloyd G. Alch, M.D., Richard Alexander, M.D., Jeffrey S. Anderson, M.D., Robert J. Aquino, M.D., Yadon Arad, M.D., Joseph P. Arno, M.D., David E. Baum, M.D., James R. Beutnagel, M.D., Joel S. Bogner, M.D., Charles L. Boursier, M.D., Scott J. Campbell, M.D., Kenneth W. Cartaxo, M.D., Edgar H. Castellanos, M.D., Joseph F. Ceravolo, M.D., Manoj V. Chag, M.D., Patricia C. Chase, M.D., Kenneth G. Christian, Jr., M.D., Mark S. Clippinger, M.D., John T. Columbus, M.D., Michael Cooks, M.D., Craig J. Cott, M.D., Mary Dampier, M.D., David M. Davis, M.D., Patrick J. DiFonzo, M.D., Andrew B. Edwards, M.D., Nancy J. Ferguson, M.D., Denise F. Ferraris, M.D., Kathy W. Forred, M.D., Daniel S. Frank, M.D., Michael S. Gelfond, M.D., Michael G. Ginder, M.D., Keith S. Goldstein, M.D., Maria T. Granzotti, M.D., Robert E. Gross, M.D., Thomas K. Hall, M.D., John A. Hatherley, M.D., Anthony J. Horwitz, M.D., Donald A. Human, M.D., Jonathan A. Jarman, M.D., Jerry Jones, III, M.D., Mark R. Kaehler, M.D., Allen Kagan, M.D., K. Michael Keil, M.D., Martin E. Kernberg, M.D., Herschell King, M.D., M. Stephen Kramer, M.D., Steven M. Kushel, M.D., Charles J. Kutner, M.D., Richard E. Lally, M.D., Peter Lamelas, M.D., Lucille Lanna, M.D., Stephen G. Larkin, M.D., Phillip J. Lastella, M.D., Robert N. Leach, M.D., Richard E. Leahy, M.D., Arthur H. Legate, M.D., Jack M. Levin, M.D., Ronald J. Lugo, M.D., James W. Lunan, M.D., Soren S. Madden, M.D., Mian A. Majeed, M.D., Thomas A. Malone, M.D., Michael R. Monolescu, M.D., John A. Mardones, M.D., Gil Z. Marzinek, M.D., Stanley D. Meers, M.D., Douglas M. Middleton, M.D., Lance E. Montauk, M.D., Charles Jay Morris, M.D., J.D., Peter J. Muran, M.D., Julia I. Nathan, M.D., Kurt F. Papenfus, M.D., Jay L. Patankar, M.D., Howard A. Peth, Jr., M.D., Thomas J. Pliura, M.D., David A. Poggemeier, M.D., Yashbir S. Rana, M.D., Allan Jay Raskin, M.D., Karin V. Rhodes, M.D., Atwood L. Rice, III, M.D., Manuel A. Rivera, M.D., Albert J. James Rosenthal, M.D., John W. Sanders, M.D., Martin N. Schnell, M.D., Steven M. Schreiber, M.D., Michael J. Shaw, M.D., Robin R. Shaw, M.D., David M. Siwicki, M.D., Robert A. Slutsky, M.D., Robin P. Smith, D.O., Perry J. Spavento, M.D., Leo W. Sullivan, M.D., Robert B. Sussman, M.D., Michael S. Taplits, M.D., Richard E. Thistle, Jr., M.D., Hartley M. Thomas, M.D., Richard Y. Thorpe III,

M.D., Jane E. Tonkin, M.D., William D. Torres, M.D., Allen G. Tucker, M.D., Laurie D. Vogel, M.D., Deborah S. Weber, M.D., Anthony T. White, M.D., Kipp A. Young, M.D. Plaintiffs–Appellants,

Donald P. Ables, M.D., Carlos Alvarado, M.D., Daniel J. Anhalt, M.D., Robert W. Bates, M.D., George B. Beranek, M.D., Jeffrey D. Blodgett, D.O., Michael L. Brown, M.D., Philip A. Brown, M.D., Marianne C. Burke, M.D., Kwok Wai Chiu, M.D., David S. Clark, M.D., Daria M. Davidson, D.O., Sylvester A. Domme, Jr., M.D., Thomas L. Eaton, M.D., David S. Engelhardt, M.D., Michael C. Finger, M.D., William F. Flader, M.D., Jessica A. Furer, M.D., Kenneth J. Gallant, D.O., Virind D. Gupta, M.D., Steven D. Hanks, M.D., John R. Harris, M.D., Stanley E. Hartman, M.D., James W. Hayden, M.D., Beth E. Haynes, M.D., Joseph F. Hederman, M.D., Dan Heslinga, M.D., Jeffrey P. Howard, M.D., Gloria S. Huckeby, M.D., Raymond F. Jarris, Jr., M.D., Robert J. Jeddeloh, M.D., Daniel H. Kallmerten, M.D., James F. Kenny, M.D., Garry J. Kiernan, M.D., Jahangir Koleini, M.D., G. Thomas Kraus, M.D., Joseph B. Liebman, M.D., Robert Lippa, M.D., Etta Lovitt, M.D., Michael R. Lozano, M.D., Paul F. Paschall, M.D., Deborah Porter, M.D., Frank L. Prasnal, Jr., M.D., Peter J. Reden, M.D., Karl Richey, M.D., David J. Ricketts–Kingfisher, M.D., Coleen Riley, M.D., Rodrigo Rojas, M.D., Kathleen L. Roth, M.D., Julie M. Sabatinos, M.D., Louis Shicker, M.D., Chester J. Skiba, Jr., M.D., R. Giuseppi Slater, M.D., Lee Slavin, M.D., Ronald K. Sterrenberg, D.O., Thomas S. Talkowski, M.D., Robert S. Tano, M.D., Bruce R. Tizes, M.D., Monique M. Van Berkum, M.D., Louis V. Verre, D.O., Hector J. Villanueva, M.D., Barry A. Wayne, M.D., James A. Wichser, M.D., Joseph D. Zirneskie, M.D., Philip A. Zurowsky, M.D., Plaintiffs,

v.

AMERICAN BOARD OF EMERGENCY MEDICINE, Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial Hospital, Loma Linda University Medical Center, Mercy Catholic Medical Center–Misericordia Division, St. Anthony Hospital, Council of Emergency Medicine Residency Directors, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, Saint Francis Hospital & Medical Center, Defendants–Appellees,

Richard Stennes, Michael Bishop, Richard Braen, Joseph Clinton, Gerald Healy, Bruce Janiak, Scott M. Jones, Robert Knopp, Harvey Meislin, Benson Munger, Robert Neerhout, Douglas Rund, Judith Tintinalli, Michael Vance, Gerald Whelan, Henry A. Thiede, M.D., Richard I. Shader, M.D., Steven J. Davidson, M.D., Leonard D. Hudson, M.D., Children's Hospital (San Diego), Kettering Medical Center, Lincoln Medical & Mental Health Center, Lutheran General Hospital, Medical College of Pennsylvania and Hospital, Our Lady of Mercy Medical Center, Tri–City Medical Center, Ohio State University, Oregon Health Sciences University Hospital, University Medical Center (Tucson, Arizona), Frank A. Disney, M.D., The Johns Hopkins Hospital, Part of the Johns Hopkins Health System, Ohio State University Hospital, Porter Memorial Hospital, Riverside Methodist Hospitals, UCLA Medical Center, University

of California (Irvine) Medical Center, University of California (San Diego) Medical Center, University Hospital–SUNY at Stony Brook, University Hospital at the University of New Mexico School of Medicine, University of Massachusetts Medical Center, Defendants,

v.

**United States of America, Intervenor–Plaintiff.**

Docket Nos. 03–6153(L), 03–6163(XAP), 03–6165(XAP), 03–6157(XAP), 03–6185(XAP), 03–6187(XAP), 03–6167(XAP) and 03–6177(XAP).

United States Court of Appeals, Second Circuit.

Argued: Oct. 25, 2004.

Decided: Oct. 7, 2005.

Jeremy R. Kasha, Proskauer Rose LLP, New York, New York (Colin A. Underwood, Proskauer Rose LLP, New York,

New York; Ralph L. Halpern, Mitchell J. Banas, Jr., Jaeckle Fleischmann & Mugel LLP, Buffalo, New York, on the brief), for Plaintiff–Appellant Gregory F. Daniel, M.D., on behalf of himself and others similarly situated.

Jeffrey D. Ubersax, Jones Day, Cleveland, Ohio (Robert H. Rawson, Jr., Elizabeth A. Grove, on the brief), for Defendant–Appellee American Board of Emergency Medicine.

Jonathan A. Damon, LeBoeuf, Lamb, Greene & MacRae, LLP, New York, New York, for Defendants–Appellees Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Loma Linda Medical Center and St. Anthony Hospital–Central.

Robert E. Glanville, Phillips Lytle, LLP, Buffalo, New York, for Defendant–Appellee Council of Emergency Medicine Residency Directors.

Douglass G. Hewitt, Michael Best & Friedrich, LLP, Chicago, Illinois, for Defendant–Appellee Methodist Hospital of Indiana.

Samuel W. Silver, Schnader Harrison Segal & Lewis LLP, Philadelphia, Pennsylvania, for Defendant–Appellee Mercy Catholic Medical Center–Misericordia Division.

Nancy G. Lischer, Hinshaw & Culbertson, Chicago, Illinois, for Defendant–Appellee St. Francis Hospital & Medical Center.

Denise M. Gunter, Nelson, Mullins, Riley & Scarborough, Winston–Salem, North Carolina, for Defendant–Appellee Forsyth Memorial Hospital.

Before: McLAUGHLIN, KATZMANN, and RAGGI, Circuit Judges.

RAGGI, Circuit Judge:

Plaintiffs-appellants are licensed physicians who practice or had practiced emergency medicine throughout the United States although they did not complete formal residency training programs in that specialty. They allege that the defendants, the American Board of Emergency Medicine ("ABEM"), the Council of Emergency Medicine Residency Directors ("CORD"), twenty-eight named hospitals, and various individuals now or previously associated with these institutions and organizations, colluded to restrain trade in connection with the practice of emergency medicine in violation of Section 1 of the Sherman Act, see 15 U.S.C. § 1, and to monopolize or attempt to monopolize the market for ABEM-certified and -eligible doctors in violation of Section 2 of the Sherman Act, see id. § 2. Plaintiffs specifically complain that the defendants manipulated the residency training requirement for ABEM certification to limit the number of doctors certified in emergency medicine in order to guarantee super-competitive compensation for such doctors and to deny certification and its attendant compensation benefits to members of · the plaintiff class.

Plaintiffs now appeal a judgment of the United States District Court for the Western District of New York (Richard J. Arcara, Judge; Leslie G. Foschio, Magistrate Judge ), entered on June 20, 2003, dismissing their Second Amended Complaint for lack of antitrust standing. See Daniel v. American Bd. of Emergency Med., 269 F.Supp.2d 159 (W.D.N.Y.2003). Defendants insist that the case was properly dismissed not only for lack of antitrust standing but also for lack of personal jurisdiction and venue in the Western District of New York. We agree with the defendants that the lack of personal jurisdiction and venue supports dismissal. While such

a conclusion might permit us to order transfer of this case to a district where personal jurisdiction and venue properly obtain, we conclude that such a transfer is not in the interests of justice in this case because the plaintiffs lack antitrust standing to pursue their claims. Accordingly, we affirm the judgment of the district court dismissing the plaintiffs' complaint in its entirety.

## I. Background

### A. The Parties

As background to our discussion of the plaintiffs' antitrust claims, we briefly outline the roles played by the parties in the delivery of emergency medical care.

#### 1. The Defendants–Appellees

##### a. American Board of Emergency Medicine

Defendant ABEM is a Michigan not-for-profit corporation that was established in 1976 to certify physicians in emergency medicine. Its offices, records, and staff are located in East Lansing, Michigan, and its day-to-day activities take place there.

Like twenty-three other medical certification boards representing different disciplines of medicine and surgery, ABEM is a member of the American Board of Medical Specialties ("ABMS"), an umbrella organization formed to assist the member specialty boards in fulfilling their missions. ABEM's professed mission, as stated in its by-laws, is to "improve the quality of emergency medical care," to "establish and maintain high standards of excellence in the specialty of emergency medicine," to "improve medical education and facilities for training emergency physicians," to "administer evaluations of specialists in emergency medicine applying for certification and recertification," to "grant and issue qualified physicians certificates or other recognition of special knowledge and skills in emergency medicine and ... suspend or revoke same," and to "serve the public, physicians, hospitals and medical schools by furnishing lists of those Diplomates certified by" ABEM. ABEM By–Laws, art. II.

ABEM is not a membership organization. Rather, like other ABMS boards, ABEM establishes educational criteria for its medical specialty, administers an examination, and certifies those who pass as ABEM "Diplomates." Notably, for purposes of this action, ABEM has never administered its certification examination in New York State.

ABEM certification is not a license required to practice emergency medicine in any state. Nor is ABEM the only board that certifies physicians in emergency medicine. The American Academy of Emergency Medicine and the American Board of Osteopathic Medicine also award certifications in emergency medicine based on their own standards. Nevertheless, plaintiffs assert that some hospitals restrict their hiring to ABEM-certified physicians, while others base compensation and promotion decisions on ABEM certification. Plaintiffs submit that alternative board certifications do not afford physicians the same prestige or opportunities for high remuneration as ABEM certification, a result of defendants' purposeful efforts to make ABEM certification the "*sine qua non* of the practice of emergency medicine." Appellants' Br. at 7.

In 1976, when ABEM initially sought approval as a specialty board from ABMS, only thirty emergency medicine residency programs existed in the United States. To accelerate recognition of the specialty, ABEM proposed two initial eligibility tracks for doctors seeking to take its certification examination: (1) the practice track, which required applicants to have

completed 7,000 hours and 60 months of practicing or teaching emergency medicine; and (2) the residency track, which required applicants to have completed an approved residency training program.[1] From the start, ABEM expressly stated that the practice track was an interim eligibility alternative to remain available only for eight years following the first administration of ABEM's certification examination in 1980.[2] It was expected that, in that time frame, additional residency training programs would be developed and accredited, making it practical to require residency training in emergency medicine, rather than practical experience, as the eligibility requirement for the certification examination.[3]

As planned, ABEM closed its practice track on June 30, 1988. Since that date, only physicians who have completed a residency program in emergency medicine have been eligible to take the ABEM certification exam. A notable exception operated between 1990 and 1995 when a number of physicians, already board certified in internal medicine after completing a residency program in that specialty, were permitted to take the ABEM certification examination without completing another residency program in emergency medicine. Plaintiffs assert that ABEM's recognition of this exception was itself part of the defendants' conspiratorial scheme.

### b. Council of Emergency Medicine Residency Directors

Defendant CORD, also a Michigan not-for-profit corporation, was established in 1990 as a national association to facilitate communication among the directors of emergency medicine residency training programs around the country. CORD's stated purposes include improving the quality of emergency medical care, establishing and maintaining high standards of excellence in emergency medicine programs, and improving the quality of instruction by the exchange of ideas among the faculties of such programs. Plaintiffs

---

1. This proposal was submitted, in the first instance, to the various specialty boards and medical associations under whose sponsorship ABEM operated from 1976 until 1986. These sponsors included the American Boards of Family Practice, Internal Medicine, Obstetrics and Gynecology, Otolaryngology, Pediatrics, Psychiatry and Neurology, and Surgery, as well as the American Medical Association, the American College of Emergency Physicians, and the Society for Academic Emergency Medicine.

2. ABEM's 1976 application to ABMS for specialty recognition described the practice eligibility track alternative as follows:
 To be eligible under this category, the applicant must have:
 A. Accumulated 7,000 hours in practice and/or teaching of emergency medicine
 1. accumulated 2,800 of the 7,000 hours within any 24 month period prior to any application
 2. accumulated the 7,000 hours over a minimum of 5 years

B. Accumulated 50 hours of approved continuing medical education in emergency medicine for each year in practice after 1973.
 *Eight years after the first examination administration, the practice eligibility category will expire.*
 ABEM Application to ABMS (Munger Aff. Ex. F (Jan. 27, 1995)) (emphasis added).

3. Other ABMS-approved specialty boards also utilized a temporary practice track during the early years of the specialty. Of the six new medical specialty boards established since 1950, including ABEM, all offered practice-track alternatives to residency training for between four and ten years, after which successful completion of residency training became the essential qualification to sit for a certification exam. Of thirty-three ABMS-approved subspecialties established since 1975, all offered practice-track alternatives for between two and five years before insisting on residency training. Munger Aff. ¶¶ 27–28 & Ex. J.

assert that CORD seeks to maintain formal residency training as the exclusive prerequisite to taking the ABEM certification exam.

### c. *The Hospital Defendants*

Twenty-eight hospitals were named as defendants in plaintiffs' Second Amended Complaint. To the extent these hospitals hire ABEM-certified doctors to perform emergency medical services, they may be viewed as consumers who, plaintiffs submit, pay a premium for the ABEM credential. To the extent these hospital defendants also operate residency training programs, they may be viewed as suppliers of the only doctors presently eligible to take the ABEM certification exam. Plaintiffs submit that the hospitals, like CORD, thus have an interest in perpetuating formal residency training as the essential prerequisite for the ABEM certification exam.

Of the twenty-eight hospitals originally sued in this case, only nine remain as appellees: Children's Hospital of Michigan, Detroit Receiving Hospital and University Health Center, Forsyth Memorial

Hospital, Loma Linda University Medical Center, Mercy Catholic Medical Center–Misericordia Division, St. Anthony Hospital, Mercy Hospital and Medical Center, Methodist Hospital of Indiana, and Saint Francis Hospital and Medical Center (the "hospital defendants").[4] Each of these defendants is incorporated in a state other than New York and maintains its principal place of business outside New York.[5]

### 2. *The Plaintiffs–Appellants*

Plaintiff-appellant Dr. Gregory F. Daniel, the other 175 named plaintiffs, and the approximately 14,000 members of the proposed plaintiff class are physicians who practice or have practiced emergency medicine. They allege that ABEM has refused or would refuse to allow plaintiffs to take its certification examination because they have not completed residency training programs in emergency medicine or they failed to meet the practice track requirements before ABEM closed that option in 1988.[6] Plaintiffs claim that they could satisfy the practice eligibility alternative at present, if allowed to do so.

4. Of the other defendants named in this action, the district court dismissed fifteen hospitals and all but two individual defendants in various decisions not challenged on appeal. *See Daniel v. American Bd. of Emergency Med.*, 212 F.R.D. 134 (W.D.N.Y.2002); *Daniel v. American Bd. of Emergency Med.*, 235 F.Supp.2d 194 (W.D.N.Y.2002); *Daniel v. American Bd. of Emergency Med.*, 237 F.Supp.2d 336 (W.D.N.Y.2002); *Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. 127, 278–79 (W.D.N.Y.1997); *Daniel v. American Bd. of Emergency Med.*, 802 F.Supp. 912 (W.D.N.Y.1992). In addition, plaintiffs reached prejudgment settlements with three dismissed and two remaining hospital defendants. Finally, the appeal to this court was withdrawn or voluntarily dismissed with respect to the two remaining individual defendants, Henry A. Thiede and Frank A. Disney, and two hospital defendants, Our Lady of

Mercy Medical Center and The Johns Hopkins Hospital, Part of the Johns Hopkins Health System.

5. Of the twenty-eight original hospital defendants, none was located in the Western District of New York, and only two were located in New York State: University Hospital—State University of New York at Stony Brook, located in Suffolk County, and Lincoln Medical and Mental Health Center, located in New York City. These hospitals were dismissed and are not before us on appeal.

6. Named plaintiff John A. Timmons, M.D., has now taken and passed the ABEM certification exam, although he was originally denied the opportunity to do so when he attempted to establish eligibility under the practice track after that option closed in 1988.

To use Dr. Daniel as an example, he applied to take the ABEM certification test in 1988, before the practice track closed. ABEM rejected his application because he had not completed a residency training program in emergency medicine and he then lacked the required 60 months' experience. Apparently, Dr. Daniel had practiced emergency medicine for the required 7,000 hours, but he had acquired that experience in less than five years. By the time Dr. Daniel completed 60 months' work in emergency medicine, ABEM had closed the practice track alternative to take its certification examination. Dr. Daniel nonetheless presently holds an alternative certification in emergency medicine from the American Academy of Emergency Medicine. He has held an attending physician position in the emergency medicine department of Sisters of Charity Hospital in Buffalo, New York, and a staff physician position in emergency medicine at St. Joseph's Medical Center Hospital in Cheektowaga, New York. Certain other named plaintiffs have similarly qualified for alternative certifications in emergency medicine and have held positions in hospital emergency medicine departments during the pendency of this action.

### B. The Alleged Antitrust Conspiracy

Plaintiffs allege that ABEM, CORD, numerous named and unnamed hospitals, and various individuals associated with these organizations and institutions, by closing the ABEM practice track while placing a premium on ABEM certification, have unlawfully restrained trade and monopolized the market for ABEM-certified and -eligible physicians, injuring competition generally and plaintiffs specifically.[7]

With respect to the effect on competition, plaintiffs allege that defendants conspired to limit the pool of candidates eligible to sit for the ABEM certification examination to doctors who had completed formal residency programs (with the limited exception from 1990 to 1995 for doctors already certified in internal medicine), deliberately excluding physicians like the plaintiffs who, despite their lack of residency training, possess years of emergency medicine experience. They submit that, as a result of this scheme, the defendants have created an artificial shortage of ABEM-certified and -eligible physicians, thereby allowing doctors possessing this credential to demand supercompetitive remuneration.

With specific reference to themselves, plaintiffs assert that the conspiracy has unreasonably prevented them from competing in the relevant market because the hospital defendants and "the majority of desirable and or/better-paying emergency departments, now require, or will soon require," ABEM certification as a prerequisite to employment or professional advancement. Second Am. Compl. ¶ 82. As a result, plaintiffs submit that they receive "substantially less remuneration than ABEM certified physicians" and they have "suffered and continue[ ] to suffer substantial losses of income for that period during which they would have been eligible to take the ABEM certification examination and compete for higher salaries." *Id.* ¶ 104. Plaintiffs further assert that, as a

---

7. Plaintiffs allege that the relevant geographic market is the United States and the relevant product market is the market for "ABEM certified and ABEM eligible ... emergency physicians." Second Am. Compl. ¶¶ 91–92. Defendants submit that the relevant product market is broader, including all emergency room physicians, not only those who are ABEM certified or eligible. Because the district court structured discovery to concentrate the parties' efforts on certain topics other than the relevant geographic and product markets, we do not attempt to resolve this dispute on the present record. For purposes of this appeal, we assume that the relevant markets are as alleged by the plaintiffs.

result of the conspiracy, they have been "denied emergency medicine positions at hospitals, trauma centers, and academic centers throughout the United States solely by reason of not being ABEM certified or ABEM eligible"; "forced to compete for an ever-decreasing pool of positions available to non-ABEM certified emergency physicians"; and precluded from obtaining positions "in more desirable locations." *Id.* ¶¶ 104–07. Finally, plaintiffs allege that their lack of ABEM certification has resulted in members of the class being discharged, demoted, and relegated to undesirable work assignments, "all with concomitant losses of remuneration." *Id.* ¶¶ 108–09.[8]

## C. *The Procedural Background*

The history of proceedings in this case is extensive and complex. We here reference only those parts relevant to this appeal.

### 1. *The Original and First Amended Complaints*

When this action commenced on September 25, 1990, no antitrust violation was pleaded. Instead, a single plaintiff, Dr. Daniel, sued a single defendant, ABEM, in New York State court for alleged violations of the New York Human Rights Law, *see* N.Y. Exec. Law §§ 290–301, as well as the Due Process and Equal Protection Clauses of the Constitution, *see* U.S. Const., amend. XIV, as a result of ABEM's 1988 refusal to allow Daniel to sit for its certification examination.[9] ABEM removed the action to federal court and moved to dismiss the complaint, prompting Daniel to amend his pleading to substitute federal antitrust claims for those raised under the Constitution and to add ABEM's board members as individual defendants. *See* First Am. Compl. ¶¶ 28, 85–100.

On April 5, 1991, ABEM and its board members moved to dismiss the first amended pleading. The matter was referred to Magistrate Judge Leslie G. Foschio who, on February 2, 1992, issued the first of what would be many carefully reasoned, detailed reports in this case. Magistrate Judge Foschio recommended that the district court grant dismissal for lack

---

**8.** Plaintiffs have not always been consistent in labeling the theory of their antitrust claims. In their initial brief to this court, they appeared to argue a group boycott. Group boycotts "generally consist of agreements by two or more persons not to do business with other individuals, or to do business with them only on specified terms." *Balaklaw v. Lovell,* 14 F.3d 793, 800 (2d Cir.1994) (citation and emphasis omitted). Defendants, however, note in their appellate brief that the plaintiffs expressly disclaimed that theory in the district court, explaining that their claim is "[n]ot technically" a group boycott but, instead, "a conspiracy [claim] to raise the prices and keep the prices up." *Daniel v. American Bd. of Emergency Med.,* 90–CV–1086A, Tr. at 63 (W.D.N.Y. May 23, 2003). In their reply brief, plaintiffs omitted any reference to a group boycott, focusing instead on a theory of market exclusion. At oral argument, they explained that, in fact, their theory would depend on the relevant market: if the market is

defined to include all emergency physicians, their theory is group boycott; if the market is limited to ABEM-certified and -eligible physicians, their theory is market exclusion. As noted in the immediately preceding footnote, on this appeal, we assume that plaintiffs' narrower market definition will prevail. Nevertheless, it makes no difference to our analysis which market definition controls this case nor whether plaintiffs' claims are presented on a group-boycott or market-exclusion theory.

**9.** Daniel alleged that ABEM violated the New York Human Rights Law by requiring him "to submit a photograph with his application to take the test," Compl. ¶ 7, and the Fourteenth Amendment "by subjecting [him] to arbitrary and capricious requirements on a selective basis when the same are not required of others seeking to be qualified as Diplomates of the American Board of Emergency Medicine," *id.* ¶ 13.

of personal jurisdiction as to all individual defendants except Dr. Henry A. Thiede, a New York resident who had formerly served as an ABEM board member and director. He further recommended that the defendants' motion to dismiss for failure to state an antitrust claim be denied. The district court adopted these recommendations on August 20, 1992. *See Daniel v. American Bd. of Emergency Med.*, 802 F.Supp. 912, 918 (W.D.N.Y.1992) (incorporating magistrate judge's report).

### 2. The Second Amended Complaint

Two years later, on January 13, 1994, Dr. Daniel amended his complaint a second time, adding 175 physicians as named plaintiffs and CORD, twenty-eight hospitals, and Frank A. Disney, a former ABEM director who resided in the district, as named defendants. The named plaintiffs sought to represent a class consisting of 14,000 physicians who "currently practice or have practiced emergency medicine in the United States." Second Am. Compl. ¶ 23. The original Human Rights Law claim was deleted from the Second Amended Complaint, which now alleges only antitrust causes of action. This Second Amended Complaint is the operative pleading for purposes of this appeal.

### a. The Initial Motion to Dismiss the Second Amended Complaint

In May 1994, after preliminary discovery limited to issues of jurisdiction and immunity, the defendants moved to dismiss the Second Amended Complaint or, alternatively, for summary judgment, on various grounds including the statute of limitations, failure to state a claim, certain immunity defenses, lack of personal jurisdiction, and improper venue. After receiving two reports from Magistrate Judge Foschio recommending against dismissal, the district court so ruled on November 19, 1997. *See Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. 112, 117 (W.D.N.Y.1997) (adopting recommendation to deny defendants' motion to dismiss on grounds of statute of limitations and failure to state a claim and incorporating magistrate judge's report); *Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. 127, 143–45 (W.D.N.Y.1997) (adopting recommendation to deny defendants' motion to dismiss for lack of personal jurisdiction and improper venue and incorporating magistrate judge's report).[10]

With respect to personal jurisdiction, an argument that had been raised in support of dismissal by all defendants-appellees except ABEM, the district court concluded that New York law did not provide for personal jurisdiction over CORD and the hospital defendants but that Section 12 of the Clayton Act did. *See id.* at 143–44, 197–205.[11] As for the defendants' venue challenge, the district court concluded that venue was proper in the Western District of New York as to ABEM under Section 12 of the Clayton Act and as to all defendants under the general federal venue

---

**10.** In its second November 19, 1997 opinion, the district court rejected both a constitutional challenge to the service of process provision in Section 12 of the Clayton Act and defendant Forsyth Memorial Hospital's motion to certify that question for interlocutory appeal. *Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. at 144–45. The constitutional challenge had prompted the United States' intervention in this action. *See* 28 U.S.C. § 2403(a). This issue is not before us on appeal, nor is the United States.

**11.** The two individual defendants named in the Second Amended Complaint, Thiede and Disney, both Rochester, New York residents, also did not raise jurisdictional defenses, *see Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. at 148 n. 4, but these individuals are not before us on appeal, as noted *supra* note 4.

statute, 28 U.S.C. § 1391(b). *See id.* at 144, 256–63, 271–76. On October 9, 2002, CORD, Mercy Hospital, and Methodist Hospital, joined by other defendants, moved the district court to certify for interlocutory appeal its Section 12 rulings as to personal jurisdiction and venue, but the district court never ruled on this motion.

#### b. *The Second Motion to Dismiss the Second Amended Complaint*

The parties proceeded to a second phase of discovery limited to issues related to class certification. When, upon completion of this discovery, plaintiffs moved for class certification, defendants crossed-moved once again for dismissal, this time asserting plaintiffs' lack of "antitrust standing." Once again, the motions were referred to Magistrate Judge Foschio, whose report recommending dismissal was adopted by the district court on June 30, 2003. *See Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d 159, 163–64 (W.D.N.Y.2003) (granting dismissal and incorporating magistrate judge's report). Applying a two-part analysis to the antitrust standing inquiry, the district court concluded that plaintiffs (1) failed to allege an "antitrust injury" because they were themselves seeking to charge super-competitive fees for their services; and (2) were not "efficient enforcers" of the antitrust laws because they sought to join, not to disband, the complained-of cartel in order to share in the "higher levels of compensation created by the charged conspiracy." *See id.* at 163–64. This appeal followed.

### II. *Discussion*

A. *Section 12 of the Clayton Act Does Not Permit the Exercise of Personal Jurisdiction Over CORD and the Hospital Defendants in the Western District of New York*

With the exception of ABEM, all defendants before us on this appeal had moved in the district court for dismissal of this action for lack of personal jurisdiction.[12] The district court rejected the motion on the merits, ruling that, although New York law did not afford personal jurisdiction over these defendants, *see* N.Y.C.P.L.R. §§ 301–302, Section 12 of the Clayton Act did. *See Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 197–255. Plaintiffs do not dispute the district court's conclusion about New York law, but defendants-appellees (again with the exception of ABEM) do challenge the district court's construction of Clayton Act Section 12 to support personal jurisdiction in this case. Accordingly, these "jurisdiction defendants" submit that lack of personal jurisdiction affords an alternative ground for affirmance of the judgment of dismissal in this case. *See. e.g., ACEquip Ltd. v. American Eng'g Corp.,* 315 F.3d 151, 155 (2d Cir.2003) ("Our court may, of course, affirm the district court's judgment on any ground appearing in the record, even if the ground is different from the one relied on by the district court.").[13]

---

**12.** Apparently, the district court had concluded on its consideration of defendants' motion to dismiss the First Amended Complaint that it had personal jurisdiction over ABEM pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, a conclusion defendants did not dispute. *See Daniel v. American Bd. of Emergency Med.,* 802 F.Supp. at 918–19. ABEM never objected to personal jurisdiction in the district court with respect to the Second

Amended Complaint, arguing only that venue was improper in the district. *See Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 197.

**13.** Indeed, while defendants initially filed a cross-appeal raising challenges to interlocutory rulings by the district court, including its rulings on personal jurisdiction and venue, our court dismissed the cross-appeal as un-

■ We review *de novo* the district court's legal conclusions regarding personal jurisdiction, *see Sunward Elecs., Inc. v. McDonald,* 362 F.3d 17, 22 (2d Cir.2004); *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d 135, 151 (2d Cir. 2001), and we conclude that Section 12 of the Clayton Act did *not* confer personal jurisdiction over the jurisdiction defendants in this case.

1. *The Worldwide Service of Process Provision of Clayton Act Section 12 Can Supply Personal Jurisdiction Only in Cases Where Venue Is Established Under Section 12*

 a. *Section 12*

Section 12 of the Clayton Act states:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. As this language makes plain, the section consists of two parts. The part before the semicolon addresses venue, permitting antitrust actions against corporations to be maintained "not only in the judicial district whereof [the corporate defendant] is an inhabitant, but also in any district wherein it may be found or transacts business." The part after the semicolon provides for worldwide service of process and, therefore, the exercise of personal jurisdiction "in such cases." In this case, it is undisputed that the venue

provision of Section 12 does not apply to any of the jurisdiction defendants.[14] Thus, in reviewing the district court's exercise of personal jurisdiction over these defendants, we must decide whether service of process (and personal jurisdiction) is available under Section 12 only in cases satisfying the section's specific venue provision or regardless how venue is established.

The answer turns on construction of the introductory phrase "in such cases" in the process provision, which defines the scope of its applicability. Plainly, the phrase refers back to the venue provision; the question is whether it refers back in whole or in part. If "in such cases" refers back to the phrase "[a]ny suit, action, or proceeding under the antitrust laws," then worldwide process would be available in every antitrust case, without regard to how venue was established. On the other hand, if "in such cases" refers only to those antitrust actions in which venue is established pursuant to Section 12, then the worldwide process provision would be of no help in establishing personal jurisdiction in cases where venue depended on other statutes.

 b. *The Circuit Split on the Relationship Between Venue and Service of Process in Section 12*

Our sister circuits are split over the proper interpretation of the venue and process provisions of Section 12. The Third and Ninth Circuits hold that Section 12's service of process provision is "independent of and does not require satisfaction of" the section's venue provision. *In re Auto. Refinishing Paint Antitrust Li-*

---

necessary. *See Powell v. Schriver,* 175 F.3d 107, 113 (2d Cir.1999) (concluding that, without cross-appeal, defendant may raise as alternative ground for affirmance qualified immunity defense rejected by district court).

**14.** To establish venue as to these defendants, the plaintiffs apparently relied on the general venue statute, 28 U.S.C. § 1391(b). *See infra* Part II.B.2.

*tig.,* 358 F.3d 288, 297 (3d Cir.2004); *see Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d 1174, 1179–80 (9th Cir.2004) (holding that, "under Section 12 of the Clayton Act, the existence of personal jurisdiction over an antitrust defendant does not depend upon there being proper venue in that court"); *Go–Video, Inc. v. Akai Elec. Co.,* 885 F.2d 1406, 1408–13 (9th Cir.1989) (rejecting argument that antitrust plaintiff must satisfy Section 12's venue provision to avail itself of its worldwide service of process authorization). The District of Columbia Circuit, however, holds that "[t]he language of the statute is plain, and its meaning seems clear: ... [I]nvocation of the nationwide service clause rests on satisfying the venue provision." *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1351 (D.C.Cir.2000). We have acknowledged this split, without ourselves deciding the issue. *See In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 207 (2d Cir. 2003).

▬ Not insignificantly, however, this court was among the first to consider the relationship between the venue and service provisions of Section 12 of the Clayton Act. Over forty years ago, in *Goldlawr, Inc. v. Heiman,* we noted that the two parts of Section 12 were so closely related that "the extraterritorial service privilege is given *only* when the other requirements [pertaining to venue] are satisfied," 288 F.2d 579, 581 (2d Cir.1961) (emphasis added), *rev'd on other grounds,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962). Because *Goldlawr*'s observation was not necessary to the court's ruling, it constitutes *dictum* that does not specifically control this case. Nevertheless, we recognize that the influence of *Goldlawr*'s *dictum* has been significant. When the D.C. Circuit construed the service of process provision of Section 12 to depend on satisfaction of the sec-

tion's venue provision, it specifically cited *Goldlawr* and emphasized that, "[o]n the question of the meaning of Section 12, we align ourselves with the position taken by the Second Circuit." *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d at 1351. Today, we bring the process full circle, joining the D.C. Circuit in concluding that the plain language of Section 12 indicates that its service of process provision applies (and, therefore, establishes personal jurisdiction) only in cases in which its venue provision is satisfied.

c. *Construing the Scope of Section 12's Service of Process Provision*

(1) *The Statutory Language*

▬ In reaching this conclusion, we begin with the text of Section 12 to determine whether its language is clear or ambiguous. *See, e.g., Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *accord Freier v. Westinghouse Elec. Corp.,* 303 F.3d 176, 197 (2d Cir.2002). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. at 341, 117 S.Ct. 843. If the meaning is plain, we inquire no further. *Id.* ("Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent." (quotation marks and citation omitted)); *Freier v. Westinghouse Elec. Corp.,* 303 F.3d at 197 (and cases cited therein). Only if we discern ambiguity do we resort first to canons of statutory construction, *see United States v. Dauray,* 215 F.3d 257, 262 (2d Cir.2000), and, if the meaning remains ambiguous, to legislative history, *id.* at 264.

Applying these principles to this case, we conclude from the language and context of "in such cases" in the service of

process provision of Section 12, that the phrase plainly refers to those cases qualifying for venue in the immediately preceding clause. The common meaning of the word "such" is "having a quality already or just specified"; "of this or that character, quality, or extent: of the sort or degree previously indicated or implied"; or "previously characterized or described: aforementioned." *Webster's Third New International Dictionary (Unabridged)* 2283 (1986); *see generally Morse v. Republican Party of Va.*, 517 U.S. 186, 254, 116 S.Ct. 1186, 134 L.Ed.2d 347 (1996) ("When words in a statute are not otherwise defined, it is fundamental that they will be interpreted as taking their ordinary, contemporary, common meaning." (quotation marks and citation omitted)). The "quality" of the cases specified in the provision of Section 12 preceding the semicolon is not simply that they are antitrust cases, or even antitrust cases against corporations; it is that they are antitrust cases against corporations brought in the particular venues approved by Section 12: where the defendant is an "inhabitant," where it "may be found," or where it "transacts business." 15 U.S.C. § 22. It is "in such cases," *i.e.*, such venued cases, that Section 12 makes worldwide service of process available. We cannot make this point more clearly than Judge Moore did, writing for the panel in *Goldlawr*:

> Section 12 of the Clayton Act specifies where suit against a corporation under the antitrust laws may be brought, namely, in a district where it is an inhabitant and also where "it may be found or transacts business." Conversely, it should follow that if a corporation is not an inhabitant of, is not found in, and does not transact business in, the district, suit may not be so brought. By statutory grant *if suit is brought as prescribed in this section* "all process in such cases may be served in the district

of which it (the corporation) is an inhabitant, or wherever it may be found." Thus, "in such cases," Congress has seen fit to enlarge the limits of the otherwise restricted territorial areas of process. In other words, *the extraterritorial service privilege is given only when the other requirements are satisfied.*

*Goldlawr, Inc. v. Heiman*, 288 F.2d at 581 (footnote and citation omitted) (emphasis added). Indeed, *Goldlawr*'s construction of Section 12 finds some support in an early Supreme Court discussion of the statute. In *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927), the Court observed:

> [A]s applied to suits against corporations for injuries sustained by violations of the Anti–Trust Act, [Section 12's] necessary effect was to enlarge the local jurisdiction of the district courts so as to establish the venue of such a suit not only, as theretofore, in a district in which the corporation resides or is "found," but also in any district in which it "transacts business"—although neither residing nor "found" therein—*in which case the process may be issued to and served* in a district in which the corporation either resides or is "found."

*Id.* at 372–73, 47 S.Ct. 400 (emphasis added). The Supreme Court's use of "in which case" in the highlighted phrase to link Section 12's process provision to the satisfaction of its venue clause suggests that the phrase "in such cases" in the statute serves the same purpose.

Accordingly, we now reiterate the conclusion originally reached by this court in *Goldlawr* and formally adopted by the D.C. Circuit: the extraterritorial service provision of Clayton Act Section 12 may be invoked to establish personal jurisdiction

only when the requirements of the section's venue provision are satisfied.

### (2) The Statutory History

Because we conclude that the language of Section 12 is plain, we need not resort to legislative history, as have those of our sister circuits that construe Section 12 to be ambiguous. We do, however, note that such legislative history as exists does not support a conclusion that Congress enacted Section 12's service of process provision with the intent that it operate independently from or reach beyond the section's venue provision.

Undoubtedly, Congress viewed Section 12's "main contribution to be its expansion of the bounds of *venue.*" *Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d at 1410 (citing *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 806–08, 68 S.Ct. 855, 92 L.Ed. 1091 (1948)) (emphasis added). The purpose of the service provision, however, is less clear. Debate in the House of Representatives on the matter was sparse, and debate in the Senate, which added the service of process provision to an already drafted venue provision, is non-existent. *See Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d at 1410 (outlining sparse legislative history).[15] If the legislative history of Section 12 provides no clear insights as to Congress's purpose in enacting expanded antitrust venue and process provisions in a single sentence, that history can hardly evidence congressional approval for now divorcing Section 12's venue and process provisions so as to combine the latter with an expanded general venue statute enacted decades later, an application that obviously could not have been in the minds of any of the enacting legislators.

Indeed, as the Supreme Court has noted, although Congress intended the Clayton Act "to provide broader and more effective relief, both substantively and procedurally, for persons injured by violations of its antitrust policy," it was, in fact, quite careful in expanding venue, rejecting several broader proposals than the one finally enacted in Section 12. *United States v. National City Lines*, 334 U.S. 573, 588, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948) (noting that "[i]n adopting section 12 Congress was not willing to give the plaintiffs free rein to haul defendants hither and yon at their caprice"), *superseded in part by statute*, 28 U.S.C. § 1404(a) (superseding venue transfer holding). To the extent the legislative history speaks at all, then, it suggests Congress's intent to "fix[ ] the limits within which [the parties] could claim advantage in venue and beyond which neither could seek it." *Id.* at 588, 68 S.Ct. 1169. Thus, before the addition of a service of process amendment to Section 12, one member of Congress voiced concern that service might not be possible in some places where the expanded antitrust venue would obtain, *see Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d at 1410 (discussing objection of Rep. Webb), but nothing in the legislative history suggests that any member intended to extend service of process *beyond* the carefully expanded venue provision. Viewed in this context, Congress's

---

**15.** While we are disinclined to speculate from congressional silence or to afford undue weight to punctuation, we note that it would have been curious for Congress to have amended an existing sentence providing for expanded venue by inserting, after a semicolon, another sentence providing for service of process if the two provisions were intended to operate independently of one another. *See* William Strunk, Jr. & E.B. White, *The Elements of Style* 6 (4th ed.2000) (observing that compound sentence joined by semicolon is a better way to "suggest[ ] the close relationship between the two statements" than separate sentences punctuated by periods).

decision in Section 12 to provide for worldwide service of process only "in such cases" as satisfied the expanded venue provision sensibly served to maintain the desired venue balance at the same time that it ensured its effective operation.

(3) *Expanded Venue and Service of Process Provisions in Other Statutes Are of Little Assistance in Construing Section 12*

■ In reaching a different conclusion, the district court appears to have relied, in part, on other statutes containing special venue and service of process provisions that it concluded could operate independently of one another, notably the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa, and the Racketeer and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1965. *See Daniel v. American Bd. of Emergency Med.,* 988 F.Supp. at 199–200. Preliminarily, we observe that courts must proceed cautiously in drawing such analogies. As the Supreme Court has warned, "analysis of special venue provisions must be specific to the statute" because Congress's intent may be permissive in some circumstances and restrictive in others. *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.,* 529 U.S. 193, 204, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000) (contrasting Congress's restrictive intent with respect to venue in patent cases, actions against national banks, and geographic reach of Title VII, with its permissive intent under the Federal Arbitration Act).

In any event, attempts to analogize the venue and service of process provisions of Section 12 with counterpart provisions in the Exchange Act and RICO offer little help in resolving the parties' personal jurisdiction dispute because the text and structure of those statutes differ in important respects from the Clayton Act.

Notably, the venue provision of the Exchange Act reaches even more broadly than Section 12 of the Clayton Act, permitting suit "in the district where any act or transaction constituting the violation occurred." *Compare* 15 U.S.C. § 78aa[16] *with* 15 U.S.C. § 22 (providing for venue where the defendant is "an inhabitant," "may be found," or "transacts business"). Thus, our court has had no occasion to consider the independent operation of the Exchange Act's service of process provision because we have yet to confront a case where a plaintiff sought to establish venue through some other, broader statute. *See, e.g., Mariash v. Morrill,* 496 F.2d 1138, 1144 (2d Cir.1974) (declining to decide whether, for purposes of venue under the Exchange Act, defendant "transacts business" in the Southern District of New York because it was "clear that an act or transaction constituting the (alleged) violation (has) occurred" in that district). *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir.1972), is to the same effect: the alleged fraudulent misrepresentations were made in the Southern District of New York where venue was laid. Viewed in this context, Judge Friendly's observation in that case that

---

**16.** Section 27 of the Exchange Act states in pertinent part:

Any criminal proceeding [under this chapter] may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chap-

ter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.

certain parts of Section 27 deal with venue, while another "speaks expressly only to service of process," *id.* at 1340, hardly supports a conclusion that the service of process provision operates independently from the venue provision. Indeed, it appears doubtful that any such circumstance would arise because, as Judge Friendly further noted, Congress intended for the venue and service provisions of Section 27 "to extend personal jurisdiction to the full reach permitted by the due process clause." *Id.* at 1339.

As for the RICO statute, *see* 18 U.S.C. § 1965, which the Ninth Circuit also relied on in construing Section 12's service of process provision to operate independently of its venue provision, *see Action Embroidery Corp. v. Atlantic Embroidery, Inc.,* 368 F.3d at 1179, we note an important structural difference. While Section 12 of the Clayton Act discusses venue and service of process in one sentence, RICO separates these provisions into non-sequential, lettered subsections. *Compare* 15 U.S.C. § 22 *with* 18 U.S.C. § 1965(a), (d). More important still is a textual difference between the two statutes. The language of RICO's service of process provision does not limit its application to "such cases" as are referred to in the statute's venue provision. Rather, in RICO, Congress specifically provides for the service of process provision to apply "in any action or proceeding *under this chapter,*" that is, the chapter dealing with racketeering. 18 U.S.C. § 1965(d) (emphasis added). Given that the Clayton Act served as a model for RICO, *see United States v. Bonanno Org. Crime Family of La Cosa Nostra,* 879 F.2d 20, 24 (2d Cir. 1989), these language and structural differences between the two statutes in their treatment of venue and process only reinforce the conclusion that Congress was expressly rendering independent under RICO concepts that it had plainly linked

under Clayton Act Section 12, *cf. id.* at 25–27 (discussing other similarities and differences between RICO and the Clayton Act that reveal Congress's intent with respect to reach of these statutes). Thus, while plaintiffs urge us to construe Section 12's service of process clause to apply to the entire antitrust chapter, the narrower language of Section 12 will not support that interpretation.

In sum, when we interpret Section 12 " 'the way it is written,' " we are obliged to conclude that its service of process provision can properly confer personal jurisdiction over a defendant " 'only when the action is brought in the district where the defendant resides, is found, or transacts business,' " that is, the district where Section 12 venue lies. *GTE New Media Servs. Inc. v. BellSouth Corp.,* 199 F.3d at 1351 (quoting Herbert Hovenkamp, *Personal Jurisdiction and Venue in Private Antitrust Actions in the Federal Courts,* 67 Iowa L.Rev. 485, 509 (1982)).

■ This is not to suggest that the general venue statute does not remain available to plaintiffs in antitrust actions. Quite the contrary. *See* 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3818 (2d ed. 1986) ("[I]t is now clear beyond any doubt that the general venue statutes apply to antitrust cases."). But if 28 U.S.C. § 1391 is the basis for venue, an antitrust plaintiff cannot employ Section 12's service of process provision to secure personal jurisdiction. In such circumstances, a plaintiff must look to other service of process provisions, notably those specified in Fed.R.Civ.P. 4 or incorporated therein from state law to satisfy this requirement.

### 2. *Applying Section 12 to the Jurisdiction Defendants*

■ In view of this construction of Section 12's service of process provision, we

cannot sustain the district court's exercise of personal jurisdiction over CORD and the nine remaining hospital defendants. The district court expressly ruled that these jurisdiction defendants did not satisfy Section 12's venue provision because they did not transact business in the district. *See Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. at 263–71. Plaintiffs do not challenge this venue ruling on appeal.[17] Accordingly, for the reasons just discussed in the previous subsection of this opinion, we conclude that, because plaintiffs cannot establish venue in the Western District of New York under Section 12, they cannot avail themselves of that statute's worldwide service of process provision to establish personal jurisdiction in that district. We, therefore, affirm dismissal of plaintiffs' Second Amended Complaint against CORD and the hospital defendants for lack of personal jurisdiction.

B. *Neither the Clayton Act nor 28 U.S.C. § 1391(b) Supports Venue in the Western District of New York with Respect to ABEM*

Although ABEM did not raise a personal jurisdiction challenge in the district court, and does not do so on appeal, it does challenge the district court's conclusion that venue over this action properly resides in the Western District of New York. *See Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. at 258–63. Accordingly, it submits that lack of venue provides an alternative ground for affirming the judgment of dismissal. We agree. Because ABEM's venue challenge is based upon essentially undisputed facts, we review the district court's venue determination *de novo, see Gulf Ins. Co. v. Glasbrenner,* 417

F.3d 353, 355 (2d Cir.2005), and conclude that venue is not proper under either the Clayton Act or the general venue statute.

1. *Venue Under Section 12 of the Clayton Act*

The district court concluded that plaintiffs' claims against ABEM were properly venued in the Western District of New York under Section 12 of the Clayton Act because ABEM "transacts business" in that district. *Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. at 258–63. We must disagree.

a. *Section 12's "Transacts Business" Requirement*

■ The Supreme Court has construed the phrase "transacts business," as used in the venue provision of Clayton Act Section 12, to refer to "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." *United States v. Scophony Corp.*, 333 U.S. at 807, 68 S.Ct. 855; *accord Banana Distribs., Inc. v. United Fruit Co.*, 269 F.2d 790, 794 (2d Cir.1959) (quoting *Scophony*); *see also Eastman Kodak Co. of N.Y. v. Southern Photo Materials Co.*, 273 U.S. at 373, 47 S.Ct. 400 ("[A] corporation is engaged in transacting business in a district ... although not present by agents carrying on business of such character and in such manner that it is 'found' therein and is amenable to local process—if in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character."). Under this construction, "[t]echnical criteria such as 'mere solicitation' or 'solicitation plus' are not determinative."

---

**17.** The plaintiffs did not argue before the district court, nor do they contend on appeal, that any of the jurisdiction defendants is an "inhabitant" of the Western District of New York or may be "found" there. Thus, these alternative grounds for Section 12 venue have never been at issue.

*Banana Distribs., Inc. v. United Fruit Co.*, 269 F.2d at 794 (quoting *Scophony*, 333 U.S. at 807, 68 S.Ct. 855). Rather, the propriety of venue turns on the nature of the corporate defendant's business.

A defendant manufacturer that promotes its goods in a judicial district through product demonstrations, that solicits orders through its salesmen in that district, and that ships its goods into that district clearly "transacts business" under Section 12. *See Eastman Kodak Co. of N.Y. v. Southern Photo Materials Co.*, 273 U.S. at 374–77, 47 S.Ct. 400; *see also Banana Distribs., Inc. v. United Fruit Co.*, 269 F.2d at 794 & n. 8 (finding company transacts business where it solicits sales, maintains office, and provides customer assistance in district). But, in the view of the D.C. Circuit, so too does a defendant charged with accrediting institutions when it conducts field inspections in the judicial district as part of the accreditation process. *See Levin v. Joint Comm'n on Accreditation of Hosps.*, 354 F.2d 515, 517–18 (D.C.Cir.1966). Meanwhile, the Third Circuit has concluded that a defendant professional organization transacts business in a district when it enforces its standards against constituent organizations through direct, continual supervision of those organizations in the judicial district. *See Myers v. American Dental Assoc.*, 695 F.2d 716, 730 (3d Cir.1983).

On the other hand, when an association's business is "public relations and professional advancement," the Fourth Circuit has ruled that it does not transact business within a particular district merely because some of its members reside there and it solicits advertising time in and transmits advertisements and other professional materials into the district. *See Bartholomew v. Virginia Chiropractors Assoc.*, 612 F.2d 812, 816 (4th Cir.1979), *abrogated on other grounds, Union Labor Life Ins. Co. v.*

*Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). Similarly, the Fifth Circuit has concluded that an association of golf professionals does not transact business in a district where some of its members reside and where it advertises in magazines, makes membership materials available, and conducts a five-day program for its members. *See Golf City, Inc. v. Wilson Sporting Goods, Inc.*, 555 F.2d 426, 436–38 (5th Cir.1977).

In each of these cases, the determination whether a defendant transacted business in a district depended on a realistic assessment of the nature of the defendant's business and of whether its contacts with the venue district could fairly be said to evidence the "practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." *United States v. Scophony Corp.*, 333 U.S. at 807, 68 S.Ct. 855.

### b. *ABEM Does Not "Transact Business" in the Western District of New York*

■ The district court concluded that ABEM transacts business in the Western District of New York because it "maintains continuous contacts which amount to business continuity within this district," as evidenced by the following circumstances: (1) ABEM certified an unspecified number of physicians in New York State and, in so doing, communicated with them in this state; (2) application fees constitute 99% of ABEM's revenue, and ABEM received an unspecified amount of that revenue from the application fees of physicians in New York State; and (3) ABEM mailed a copy of its application form to plaintiff Dr. Daniel in the district. *Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. at 259–62. These facts, however, are insufficient to show that ABEM "transacts busi-

ness" in the Western District of New York.

Preliminarily, we note that, with the exception of the application mailed to Dr. Daniel, the cited contacts are with the State of New York as a whole, not specifically the Western District of New York. Only the latter contact is relevant to Section 12 venue. *See* 15 U.S.C. § 22 ("Any suit ... may be brought not only in the judicial district whereof [the defendant corporation] is an inhabitant, but also *the district ... wherein it ... transacts business.*" (emphasis added)); *see also Eastman Kodak Co. of N.Y. v. Southern Photo Materials Co.*, 273 U.S. at 374, 47 S.Ct. 400 (holding that solicitation of orders from and sale and shipment of goods to "the Georgia district ... was transacting business in that district").

In any event, these contacts must be considered in light of the nature of ABEM's business, which is certifying doctors who meet its training and testing standards in the field of emergency medicine. ABEM, which operates out of its headquarters in Michigan, neither develops its standards nor administers its certification examinations in the Western District of New York. It does not own or lease any real estate in the district. It does not maintain an office, telephone, bank account, or mailing address there. It employs no agent to carry on its operations or promote its activities in the Western District of New York. It does not advertise or solicit applicants for its certification examination in the district. Indeed, inquiries or contacts are initiated by potential applicants *to* ABEM, not the reverse. To the extent the district court found that 99% of ABEM's revenues derive from examination application fees, *see Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. at 261, it made no finding as to how much of that fee revenue derived from applicants in

the Western District of New York. Indeed, the only evidence on that point appears to be an affidavit of ABEM's executive director (in support of ABEM's motion to dismiss plaintiffs' Second Amended Complaint), which states that the revenue ABEM receives from examination applications in the Western District of New York is *de minimis* "in relation to ABEM's total revenues." Munger Aff. ¶ 7 (July 20, 1994).

With this understanding of ABEM's business, it is impossible to conclude that an unspecified number of communications by ABEM into the district in response to inquiries about tests to be administered outside the district, even when coupled with an unspecified but apparently minimal amount of revenue from test fees transmitted from applicants residing in the district, evidences the sort of "practical, everyday business or commercial concept of doing business or carrying on business of any substantial character" that the Supreme Court has equated to "transact[ing] business" for purposes of Section 12 venue. *See United States v. Scophony Corp.*, 333 U.S. at 807, 68 S.Ct. 855; *Bartholomew v. Virginia Chiropractors Assoc.*, 612 F.2d at 816; *Golf City, Inc. v. Wilson Sporting Goods, Inc.*, 555 F.2d at 436–38.

Accordingly, because we conclude that, as a matter of law, plaintiffs failed to demonstrate that ABEM "transacts business" in the Western District of New York, venue could not rest in that district pursuant to Section 12 of the Clayton Act.

### 2. *Venue Under the 28 U.S.C. § 1391(b)*

Plaintiffs submit that, even if venue does not lie in the Western District of New York under Section 12 of the Clayton Act, the district court correctly concluded that it had venue pursuant to the general federal venue statute, 28 U.S.C. § 1391(b). Although the district court's conclusions

were not limited to ABEM, because we have already concluded that the district court lacked personal jurisdiction over CORD and the hospital defendants, we focus our § 1391(b) discussion on ABEM.

Title 28 U.S.C. § 1391(b) provides in relevant part:

A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred ..., or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

We conclude that none of the three grounds for venue identified in the statute permit plaintiffs to pursue their antitrust claims against ABEM in the Western District of New York.

### a. *Section 1391(b)(1)*

Plaintiffs' reliance on § 1391(b)(1) merits little discussion because all defendants do not reside in New York State. To the extent the district court thought otherwise, its conclusion was informed by its misconstruction of the service of process provision of Section 12 of the Clayton Act.

Title 28 U.S.C. § 1391(c) defines the residence of a corporation as "any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." Because the district court ruled

that personal jurisdiction over all defendants could be obtained in the Western District of New York pursuant to the worldwide service of process provision of Section 12, it concluded that all defendants were residents of New York State. Properly construed, however, Section 12's service of process provision did not permit the district court to exercise personal jurisdiction over CORD or the hospital defendants. *See supra* Part II.A. Thus, these defendants cannot be deemed residents of New York pursuant to § 1391(c), and the district court lacked venue under § 1391(b)(1) to hear this claim against ABEM.

### b. *Section 1391(b)(2)*

In fact, it is § 1391(b)(2), not § 1391(b)(1), on which plaintiffs primarily rely to support venue over ABEM in the Western District of New York, arguing that a "substantial part of the events or omissions giving rise to [their antitrust] claim[s] occurred" in that district. In ruling in plaintiffs' favor on this point, the district court concluded that ABEM's "denial of the [certification test] applications and appeals by Daniel and five other individual plaintiffs and [its] official communication of this action to Plaintiffs in New York is sufficient to constitute a substantial part of the events giving rise to Plaintiffs' claims." *Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. at 274–75.[18] Once again, we must disagree.

Although our court has had few occasions to interpret § 1391(b)(2)

---

18. The district court rejected as a basis for venue, and properly so in our view, the New York residence of then-ABEM president G. Richard Braen and former board member and director Henry A. Thiede. *See Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. at 275. There is no claim that these individuals took any action at all in New York related

to the antitrust claim, let alone any action that might constitute a "substantial part of the events or omissions giving rise to the" antitrust claim. Nor is it alleged that any part of the activities of CORD or the hospital defendants alleged to give rise to the antitrust claims occurred in New York.

since that statute was amended in 1990, certain principles are clear. Section 1391(b)(2) does not restrict venue to the district in which the "most substantial" events or omissions giving rise to a claim occurred. *See Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 868 (2d Cir.1992); David D. Siegel, "Commentary on the 1988 and 1990 Revisions of Section 1391, Subdivision (a), Clause (2)," *printed in* 28 U.S.C.A. § 1391 at 9–10 (West 1993); *see also First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 264 (6th Cir.1998) (interpreting analogous "substantial part of the events or omission" language in 28 U.S.C. § 1391(a)(2) (relating to jurisdiction founded only on diversity)); *Setco Enters. Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994) (same). Rather, as we recently explained, § 1391(b)(2) "contemplates that venue can be appropriate in more than one district" and "permits venue in multiple judicial districts as long as a 'substantial part' of the underlying events took place in those districts." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d at 356. Nevertheless, the "substantial events or omissions" requirement does limit the forums available to plaintiffs. *See id.* at 357 (cautioning district courts to "take seriously the adjective 'substantial'" in discharging duty to "construe the venue statute strictly"). This is so because, as the Supreme Court explained before the amendment of section 1391, "[i]n most instances, the purpose of statutorily defined venue is to protect the *defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Leroy v. Great W. United Corp.*, 443 U.S. 173, 183–84, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) (emphasis in original); *see also Bates v. C & S Adjusters, Inc.*, 980 F.2d at 867 (noting that *Leroy* and other pre-amendment precedents "remain important sources of guidance" in construing the venue statute and recognizing 1990 amendments to § 1391 as "at most a mar-ginal expansion of the [general] venue provision" aimed at reducing litigation about "where the claim arose" under the former venue provision); *Cottman Transmission Sys. v. Martino*, 36 F.3d 291, 294 (3d Cir.1994) (explaining that "the current statutory language still favors the defendant in a venue dispute by requiring that the events or omissions supporting a claim be 'substantial'" and "is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute"); *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir.1995) (explaining that "by referring to 'events and omissions giving rise to the claim,' Congress meant to require courts to focus on relevant activities of the defendant, not of the plaintiff").

Thus, when a plaintiff relies on § 1391(b)(2) to defeat a venue challenge, a two-part inquiry is appropriate. First, a court should identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d at 357. Second, the court should determine whether a substantial part of those acts or omissions occurred in the district where suit was filed, that is, whether "significant events or omissions material to [those] claim[s] ... have occurred in the district in question." *See id.* (emphasis removed); *see also Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1372 (11th Cir. 2003) (asking (1) "What acts or omissions by [defendant] gave rise to [plaintiff's] claim?" and (2) "Of those acts, did a 'substantial part' of them take place in [the chosen venue]?"); *cf. Cottman Transmission Sys. v. Martino*, 36 F.3d at 295–96 (identifying alleged acts or omissions and then asking whether they are substantial).

"Substantiality" for venue purposes is more a qualitative than a quantita-

tive inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number of contacts. *See Gulf Ins. Co. v. Glasbrenner,* 417 F.3d at 357; *Cottman Transmission Sys. v. Martino,* 36 F.3d at 295–96 ("In assessing whether events or omissions giving rise to the claims are substantial, it is necessary to look at the nature of the dispute."). When material acts or omissions within the forum bear a close nexus to the claims, they are properly deemed "significant" and, thus, substantial, but when a close nexus is lacking, so too is the substantiality necessary to support venue. *See Jenkins Brick Co. v. Bremer,* 321 F.3d at 1372 (explaining that substantiality requirement of § 1391(b)(2) requires consideration only of acts or omissions that "have a close nexus to the wrong").

This principle has informed our venue analysis in other cases, even if we have not articulated the substantiality requirement specifically in terms of the nexus between the acts or omissions in the chosen forum and the nature of plaintiffs' claims. Most recently, we concluded that judgment holders' request and receipt of an order lifting an automatic bankruptcy stay in the district, which permitted the judgment holders to obtain their judgment, together with the submission, approval, or issuance in the district of the insurance policy under which the judgment allegedly must be paid, could constitute a substantial part of the events giving rise to a claim sounding in contract. *See Gulf Ins. Co. v. Glasbrenner,* 417 F.3d at 357–58 (vacating and remanding for venue determination). Similarly, in *Bates v. C & S Adjusters, Inc.,* 980 F.2d at 868, we concluded that plaintiff's receipt of a collection notice in the district was a substantial part of the events giving rise to a claim under the Fair Debt Collection Practices Act because the statute

seeks to curb the effect on consumers of abusive debt practices like the collection notices sent to the plaintiff. Also, where two agreements giving rise to a defense were negotiated through a series of communications directed to one party in the Southern District of New York, we concluded that a substantial part of the plaintiff's claim to a right to arbitration under those agreements occurred in that district and supported venue there. *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.,* 241 F.3d at 153. But when all events supporting a claim for dissolution of a defendant company (including commingling of funds, improper transactions, and failure to maintain corporate records) occurred in Illinois, we concluded that the fact of defendant's incorporation in New York, its servicing of New York hospitals, its collection of money from New York debtors, and its employment of a New York law firm did not support venue in the Southern District of New York because the New York actions did not constitute a substantial part (or, indeed, any part) of the events or omissions giving rise to plaintiff's claims. *See Friedman v. Revenue Mgmt. of N.Y., Inc.,* 38 F.3d 668, 672 (2d Cir.1994).

Other circuits have similarly resolved venue disputes by considering the connection between the acts or omissions in the filing forum and the asserted claims. *See, e.g., Jenkins Brick Co. v. Bremer,* 321 F.3d at 1372–73 (11th Cir.) (rejecting Alabama venue for plaintiff company with headquarters in that state when events giving rise to claim for breach of non-compete agreement all occurred in Southern District of Georgia); *Uffner v. La Reunion Francaise,* 244 F.3d 38, 42–43 (1st Cir.2001) (concluding that District of Puerto Rico was proper venue because loss of vessel in district's waters was substantial part of events giving rise to claim by vessel owner

for wrongful denial of insurance claim); *First of Mich. Corp. v. Bramlet*, 141 F.3d at 263–64 (6th Cir.) (concluding that Eastern District of Michigan was proper venue in case involving dispute over investment advice because financial advisor did business and underlying transactions and investments took place there); *Woodke v. Dahm*, 70 F.3d at 985–86 (8th Cir.) (holding venue improper in Northern District of Iowa where plaintiff resided and felt effects of charged trademark violations because neither alleged "passing off" nor any other event having substantial connection to claims occurred there); *Cottman Transmission Sys. v. Martino*, 36 F.3d at 295–96 (3d Cir.) (holding venue improper in Eastern District of Pennsylvania when all but one event relevant to contract, trademark, and unfair trade practice claims took place in Michigan).

Applying these principles to this case, we conclude that § 1391(b)(2) does not support venue in the Western District of New York. Plaintiffs allege a series of actions by defendants to support their antitrust claims: in 1988, ABEM closed the practice track to qualify for its certification exam; since that time, ABEM has consistently refused to permit plaintiffs to take the ABEM certification exam; meanwhile, the hospital defendants have refused to hire, promote, or pay top remuneration to doctors not certified by ABEM. Plainly, the vast majority of these acts occurred outside the Western District of New York, indeed, outside the State of New York. ABEM's decision to close the practice-track was made at its headquarters in Michigan. Similarly, ABEM's rejections of plaintiffs' applications to take its certification exam were made in Michigan. To the extent ABEM communicated its decision to plaintiffs by mail sent to their home states, plaintiffs point to only six of the 176 named plaintiffs who received such rejection notices in the Western District of New

York. As for the hospitals, whose alleged failure to hire, promote, or pay plaintiffs in a manner comparable to ABEM-certified doctors is the main alleged injury, of the twenty-eight sued in this case, not one is located in the Western District of New York.

Viewed in this context, ABEM's transmittal into the Western District of New York of a half-dozen letters rejecting applications to sit for its certification examination outside New York constitutes only an insignificant and certainly not "a substantial part of the events or omissions giving rise to the [plaintiff's antitrust] claim[s]." We conclude that these coincidental contacts are insufficient to afford venue in the Western District of New York pursuant to § 1391(b)(2).

### c. *Section 1391(b)(3)*

██ Plaintiffs contend that venue over their antitrust claims is proper in the Western District of New York pursuant to § 1391(b)(3) because, at the time this action was filed, individual defendant Henry A. Thiede resided in the Western District of New York and, given the geographic diversity of the other named defendants, there is no other district in which this action could reasonably be brought.

As this court has previously explained in discussing an analogous venue alternative in § 1391(a)(3) (relating to diversity jurisdiction), the phrase "if there is no district in which the action may otherwise be brought" indicates that venue may be based on that subsection only if venue cannot be established in another district pursuant to any other venue provision. *See Doctor's Assocs. v. Stuart*, 85 F.3d 975, 983 (2d Cir.1996) (citing 1A *Moore's Federal Practice* ¶ 0.342[3], at 4083); *see also* Wright, Miller & Cooper, 15 *Federal Practice and Procedure* § 3802.1 (Supp.2005)

(describing § 1391(a)(3), like § 1391(b)(3), as a "fallback" provision available only when there is no district in which venue can be laid pursuant to (a)(1) and (a)(2)).

In this case, § 1391(b)(2) does establish another venue for plaintiffs' antitrust claims: the Western District of Michigan. As our discussion of the facts demonstrates, a "substantial part" of the alleged events giving rise to the plaintiffs' antitrust claims occurred in East Lansing, Michigan. It is there that ABEM has its headquarters. It was there that ABEM created and then closed the practice track for its certification examination, the crux of the charged antitrust scheme. It was from there that ABEM rejected plaintiffs' applications to sit for its exam. It was there that CORD purportedly strove to maintain formal residency training as the unwaivable requirement for ABEM certification. Thus, because plaintiffs could have satisfied § 1391(b)(2) in the Western District of Michigan, they cannot rely on § 1391(b)(3) to support venue in the Western District of New York.

In sum, because neither Section 12 of the Clayton Act nor 28 U.S.C. § 1391(b) establishes venue in the Western District of New York to hear this case against ABEM, we can affirm dismissal of this action against ABEM on this alternative ground.

### C. The Transfer of this Case to Another District Where Jurisdiction and Venue Are Proper Is Not in the Interest of Justice

#### 1. Discretion to Transfer

The identified defects in personal jurisdiction and venue preclude plaintiffs from pursuing this case in the Western District of New York, despite its long history in that forum. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)

(noting "age-old rule that a court may not in any case, even in the interest of justice, extend its jurisdiction where none exists," a rule that applies even to parties who "spend years litigating claims only to learn that their efforts and expense were wasted in a court that lacked jurisdiction"). A question remains, however, as to whether we should simply affirm dismissal on these grounds or, in the interest of justice, order transfer of the action to another district where jurisdiction and venue properly obtain. *See* 28 U.S.C. § 1406(a) (permitting court to cure venue defect "in the interest of justice" by transferring case "to any district or division in which it could have been brought"); *see also Goldlawr, Inc. v. Heiman*, 369 U.S. at 465–66, 82 S.Ct. 913 (reversing dismissal of antitrust action because district court was authorized to transfer under § 1406(a) even though it lacked personal jurisdiction over defendants); *Corke v. Sameiet M.S. Song of Norway*, 572 F.2d 77, 79 (2d Cir.1978) (concluding that § 1406(a) permits courts to transfer in interest of justice whenever either personal jurisdiction or venue are improper); *SongByrd, Inc. v. Estate of Grossman*, 206 F.3d 172, 179 n. 9 (2d Cir.2000) (citing *Corke* and recognizing propriety of § 1406 transfer to cure lack of personal jurisdiction even when venue proper).

■ Courts enjoy considerable discretion in deciding whether to transfer a case in the interest of justice. *See Phillips v. Seiter*, 173 F.3d 609, 610 (7th Cir.1999). A "compelling reason" for transfer is generally acknowledged when a plaintiff's case, if dismissed, would be time-barred on refiling in the proper forum. *Id.; accord Corke v. Sameiet M.S. Song of Norway*, 572 F.2d at 80 (noting an "important purpose" of § 1406(a) transfer is to alleviate burden of statutes of limitations operating

as "procedural obstacles" to merits consideration).

 In this case, it is possible that the four-year statute of limitations applicable to antitrust actions, *see* 15 U.S.C. § 15b, might preclude plaintiffs from refiling the exact same antitrust complaint in the Western District of Michigan, unless, of course, plaintiffs could demonstrate a continuing wrong. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) ("In the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." (citations omitted)); *accord Higgins v. New York Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir.1991). Even in such circumstances, however, courts will not "waste judicial resources by transferring a case that is clearly doomed." *Phillips v. Seiter*, 173 F.3d at 610. As Judge Posner observed in *Phillips,* a court's limited jurisdiction "to decide whether to transfer or dismiss" a case over which it lacks jurisdiction thus includes "a power of limited review of the merits." *Id.* at 611. If "a peek at the merits," *id.* at 620, "reveals that the case is a sure loser in the court that has jurisdiction (in the conventional sense) over it, then the court in which it is initially filed—the court that does not have jurisdiction—should dismiss the case rather than waste the time of another court," *id.* at 611. Following these principles, this court recently affirmed dismissal of a Tucker Act claim, refusing to order § 1631 transfer to the Court of Claims because the record failed

to establish the "entitlement" necessary to support the plaintiff's due process claim. *Adeleke v. United States*, 355 F.3d 144, 152 (2d Cir.2004); *see also Aura Lamp & Lighting v. International Trading Corp.*, 325 F.3d 903, 909–10 (7th Cir.2003) (ordering dismissal rather than transfer of appeal that was plainly lacking in merit); *Haugh v. Booker*, 210 F.3d 1147, 1150 (10th Cir.2000) (affirming dismissal without requiring transfer of habeas challenge that was without merit).

So in this case, in which the issue of antitrust standing was fully litigated in the district court and has been the focus of briefing and argument on appeal, we agree with the district court that plaintiffs lack antitrust standing to pursue their claim and conclude that transfer to another district is not in the interest of justice. Accordingly, the judgment of dismissal should be affirmed.

### 2. *The Requirement of Antitrust Standing*

#### a. *The Factors Relevant to Standing*

 It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate "standing." *See Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 110 & nn. 5–6, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *see also Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 292–93 (2d Cir.1983) (Friendly, J.) (explaining requirements of antitrust standing). This standing requirement originates in the Supreme Court's recognition that, although Section 4 of the Clayton Act appears to confer a broad private right of action for antitrust damages,[19] "Congress did not in-

---

19. Section 4 states in pertinent part:
 [A]ny person who shall be injured in his business or property by reason of anything

forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant

tend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 534, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Just as in common-law tort and contract litigation, concepts such as "foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract" circumscribe a party's right to recovery, so in antitrust actions "the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them," can limit the right to sue. *Id.* at 532–33, 535–36, 103 S.Ct. 897 (noting "similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages" (footnotes omitted)). The same logic applies to claims for injunctive relief under Section 16 of the Clayton Act.[20] *See Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. at 110–13, 107 S.Ct. 484 (applying antitrust standing requirement to claims for injunctive relief).

Because the theory of antitrust standing is not codified but was developed by courts over time in response to myriad concerns presented in particular cases, it cannot easily be reduced to a "black-letter rule that will dictate the result in every case." *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. at 536, 103 S.Ct. 897. Nevertheless, certain basic principles can be identified. For example, the fact that the plaintiffs charge the defendants, at least in part, with a *per se* violation of the antitrust laws does not absolve them of the obligation to demonstrate standing. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). Further, it is useful to distinguish the question of whether an antitrust violation occurred from whether plaintiffs have standing to pursue it. To avoid confusing these issues, some courts and commentators have suggested assuming the existence of a violation in addressing the issue of standing. *See SAS of Puerto Rico v. Puerto Rico Tel. Co.,* 48 F.3d 39, 43, 46 (1st Cir.1995); *see also* 2 Phillip E. Areeda, Herbert Hovenkamp, & Roger D. Blair, *Antitrust Law* ¶ 335f, at 299 & n.63 (2d ed.2000) (collecting cases). Thus, while the issue of an antitrust violation in this case is by no means clear, for purposes of this appeal we assume the alleged violation and assess only plaintiffs' standing to pursue their claim.

Finally, we identify four factors that are generally deemed relevant to determining antitrust standing: an injury in fact (1) to plaintiffs' "business or property," *see* 15 U.S.C. § 15; (2) that is not remote from or duplicative of that sustained by a more directly injured party, *see Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. at 540–42, 103 S.Ct. 897; (3) that qualifies as an "antitrust injury," *see Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690,

resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

**20.** Section 16 states in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws . . . .

15 U.S.C. § 26.

50 L.Ed.2d 701 (1977); and (4) that translates into reasonably quantifiable damages, *see Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. at 545, 103 S.Ct. 897. *See also* 2 Areeda, Hovenkamp & Blair, *Antitrust Law* ¶ 335a, at 286 (identifying four factors and noting that antitrust standing "requires more than the constitutional minimum [of a] 'case or controversy' "). Material factual disputes exist between the parties as to the first and fourth factors. Thus, like the district court, we do not assume at this stage that these factors would necessarily be resolved against the plaintiffs. We focus instead on the remaining two factors: whether the plaintiffs have adequately demonstrated that the alleged injury to their business or property is one that the antitrust laws were intended to prevent and whether they qualify as efficient enforcers of the antitrust claims at issue.

### b. *The Antitrust Injury*

■■■■■ The fact that private plaintiffs have been injured by acts that violate the antitrust laws is not enough to confer standing to sue. Whether the relief they seek is legal or equitable, plaintiffs must demonstrate that they themselves have sustained an *"antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. at 489, 97 S.Ct. 690 (emphasis in original); *see also Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. at 110–13, 107 S.Ct. 484. In this regard, it has long and frequently been observed that "the antitrust laws ... were enacted 'for the protection of *competition,* not *competitors.*' " *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. at 488, 97 S.Ct. 690 (quoting *Brown Shoe v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502,

8 L.Ed.2d 510 (1962) (emphasis in original)); *accord Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. at 110, 107 S.Ct. 484; *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998); *see also Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,* 386 F.3d 485, 511 (2d Cir.2004) (noting that "focus of [Clayton Act] § 7, like the Sherman Act, is on competition not competitors").

To evaluate whether plaintiffs—would-be competitors in a market that they define as ABEM-certified and -eligible doctors—demonstrate "antitrust injury" as a result of the defendants' actions, it is first necessary carefully to consider the nature of plaintiffs' claim. They assert that ABEM, by insisting upon completion of a formal residency program in emergency medicine as a precondition to taking its certification test, except for the few practicing physicians allowed post–1988 to take the exam without emergency medicine residency training, artificially restricts the supply of ABEM-certified doctors. As a result, the remuneration presently received by ABEM-certified doctors is inflated, and these higher costs are then "passed on to consumers of and the persons and entities who pay for such services." Second Am. Compl. ¶ 96. In detailing their own financial injury from this scheme, plaintiffs allege that they "have been and continue to receive substantially less remuneration than ABEM certified emergency physicians" and that they are unable to "compete for the higher salaries paid to ABEM eligible and ABEM certified emergency physicians." *Id.* ¶ 104. Indeed, plaintiffs specifically plead their remuneration injury by reference to the difference between their own earnings and those of ABEM-certified doctors: "an average amount of no less than $50,000 annually." *Id.* In short, their theory of injury is not simply that ABEM-certified doctors

command super-competitive remuneration; their injury is the inability to do likewise.

As the Seventh Circuit observed in *Sanjuan v. American Board of Psychiatry and Neurology, Inc.,* such a theory does not state "an antitrust injury." 40 F.3d 247, 251–52 (7th Cir.1995). The *Sanjuan* plaintiffs were also doctors denied board certification in their field of medical specialty, in that case because they failed to pass the defendant's certification examination. Plaintiffs complained that, because English was not their native language, they were at an unfair disadvantage in taking the oral part of the examination compared to doctors born in the United States. As a result of not receiving board certification, the plaintiffs claimed that they earned less than their board-certified colleagues.

Judge Easterbrook, writing for the *Sanjuan* panel, rejected this theory of injury: "The claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up." *Id.* at 251. He tartly concluded: "Plaintiffs, who want to obtain a credential that will help them charge higher prices, have pleaded themselves out of court on the antitrust claim." *Id.* at 252.

Plaintiffs before this court submit that *Sanjuan* is distinguishable because the complaining doctors in that case were permitted to sit for their specialty certification exam, while they are not. They argue that the *Sanjuan* doctors were not "excluded from competition"; they "failed in competition." Appellants' Br. at 32. That argument, however, goes to whether the *Sanjuan* plaintiffs stated an antitrust violation, not whether they had antitrust standing to pursue such a claim. The Seventh Circuit appears to have concluded that, even if the defendant's challenged examination practice violated the antitrust laws, dismissal

was required because the injury alleged by plaintiffs—their inability to earn higher pay—was not "an antitrust injury."

This is not to suggest that a would-be competitor can never demonstrate standing to challenge an exclusionary scheme that precludes him from entering a market simply because he sues to recover the profits that he otherwise would have earned. Indeed, both the Supreme Court and this court have concluded to the contrary. *See generally Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. at 345–46, 110 S.Ct. 1884 (recognizing that, depending on the nature of the injury alleged, competitors may suffer antitrust injury); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 67 (2d Cir. 1988) (concluding putative cartel member has antitrust standing). To the extent the district court's opinion has been read to suggest that competitors seeking higher compensation do not state an antitrust injury, *see* Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 335, at 108 (2004 Supp.) (noting decision and expressing doubt that competitor claiming inability to obtain "higher compensation" as antitrust injury would be an unsuitable plaintiff to challenge a boycott), we think that characterization inapt. As the magistrate and district judges who long labored with this case recognized, the theory of antitrust injury pleaded by plaintiffs in their Second Amended Complaint was not that they were denied the competitive remuneration that the market would have awarded but for domination by the defendants' cartel. Instead, through years of litigation, plaintiffs' singular complaint was that they were denied the opportunity to command the same *super*-competitive pay earned by their ABEM-certified colleagues. *See Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d at 176–77. In a Memorandum of Law filed to

support class certification, plaintiffs described the common injury to the class as follows: defendants' "conspiracy has prevented all Plaintiffs from obtaining *the higher salaries that ABEM and ABEM eligible emergency physicians command.*" *Id.* at 176 (quoting Pls.' Mem. at 26 (Doc. 70) (emphasis added)) (quotation marks omitted). Similarly, at his deposition, lead plaintiff Dr. Daniel stated that he sought ABEM certification in order to "command a higher hourly rate" that would afford him economic *"parity"* with other ABEM-certified physicians. *Id.* (quoting Daniel Dep. at 135–36 (emphasis added)).

The conclusion that plaintiffs do not state an antitrust injury is reinforced by the narrow scope of their injunctive prayer, by which they seek only to join rather than end the exclusive ABEM arrangement in order to acquire a share of the super-competitive profits. Assuming *arguendo* that the defendants' control over the supply of ABEM-certified doctors does injure competition by restricting supply,[21] plaintiffs cannot themselves state an antitrust injury when their purpose is to join the cartel rather than disband it. *See* 2 Areeda, Hovenkamp, & Blair, *Antitrust Law* ¶ 348e, at 401 ("[T]here is no antitrust right to join a cartel."). As this court noted in *Volvo North America Corp. v. Men's International Professional Tennis Council,* a cartel member—or would-be member—who seeks to remove a restraint "that merely prevents a cartel member from acquiring a greater share of the fruits of the cartel" does not suffer antitrust injury. 857 F.2d at 67. If, however, a cartel-member plaintiff seeks to remove the restraint so he may be "free to compete—such that the member's interest coincides with the public interest in vigorous competition—" he satisfies the antitrust injury requirement. *Id.* at 67–70 (concluding that putative cartel-member plaintiff suffered antitrust injury because plaintiff's "interest may diverge from the interests of the cartel as a whole" where plaintiff challenged and sought to end five cartel practices). That is not this case. Plaintiffs do not, after all, sue to eliminate the eligibility criteria for ABEM certification that they claim allows defendants to limit market supply. Certainly, they do not seek an injunction allowing any licensed doctor to take the ABEM exam so that all who pass can receive board certification in emergency medicine. Plaintiffs do not even seek to eliminate the residency training requirement. They sue only to restore—temporarily—the practice track as an alternative to residency training so that *they* can qualify for the ABEM exam, after which they are satisfied to have the certification door shut on any other test applicants.[22] In

---

21. We note, but need not here discuss, defendants' statistical showing that the supply of doctors eligible to take the ABEM certification exam has, in fact, grown by several multiples between the closing of the practice track in 1988, a year in which 367 doctors entered residency training programs, and 1999, a year in which 1,039 doctors graduated from such training programs.

22. At oral argument on appeal, plaintiffs' counsel indicated that his clients do not, in fact, question ABEM's right to limit its certification to doctors who have completed residency training programs, a significant conces-

sion because that decision had appeared to be the critical factor supporting their claim of restraint on trade. Counsel explained that plaintiffs assert that ABEM, by offering a practice-track option for certification—but only for eight years—restricts competition between those doctors who qualified for ABEM certification under the practice track and those who no longer have that option. Carried to its logical conclusion, plaintiffs' argument would require ABEM to maintain a practice track alternative in perpetuity. When asked about that possibility, however, counsel conceded that, at some future point, presumably after plaintiffs also acquired

sum, by seeking relief that would permit them to join but not end the alleged exclusive arrangement, plaintiffs make plain that they are not complaining of an antitrust injury.

*Todorov v. DCH Healthcare Authority*, 921 F.2d 1438 (11th Cir.1991), a case relied on by the district court, supports this conclusion. In *Todorov*, the plaintiff doctor sought hospital privileges in order to join the charged anticompetitive scheme and thereby secure a share of the allegedly anticompetitive benefits. *Id.* at 1453–55. But a plaintiff who "seeks to join the exclusive arrangement" of which he complains "while leaving the exclusivity requirement otherwise intact" is simply "not a victim of antitrust injury." 2 Areeda, Hovenkamp, & Blair, *Antitrust Law* ¶ 348e, at 401. Thus, the private action in *Todorov* was dismissed for lack of standing. *Todorov v. DCH Healthcare Auth.*, 921 F.2d at 1455.

To the extent that we would consider transferring this case to the Western District of Michigan, we have no reason to think that the Sixth Circuit takes a different view of antitrust standing. In *Potters Medical Center v. City Hospital Association*, 800 F.2d 568 (6th Cir.1986), that court allowed a plaintiff hospital to sue a rival hospital to force it to end its anticompetitive practice of denying hospital privileges to physicians who also had privileges with plaintiff. This conclusion is consistent with the principle that, when a plaintiff thus "seeks to forbid exclusivity—first on its own behalf and implicitly on behalf of others," the plaintiff does state an antitrust injury because it seeks "to destroy an anticompetitive arrangement." 2 Areeda, Hovenkamp & Blair, *Antitrust Law* ¶ 348e, at 401.[23] As already noted, in this case, plaintiffs do not sue to destroy, but rather to join, defendants' alleged exclusive arrangement for supplying the market with ABEM-certified doctors so that plaintiffs can command a share of the supercompetitive remuneration that the cartel scheme makes available to ABEM-certified doctors.

Essentially conceding the merits of the magistrate judge's conclusion that a suit to achieve this goal would not state an antitrust injury, the plaintiffs argued in their objections to the report and recommendation that they should be allowed to amend their complaint for a third time, to limit their prayer for damages to the difference between their actual earnings and the amount they would have earned in a competitive market absent the conspiracy. *See generally* Fed.R.Civ.P. 15(a). They did not, however, alter the injunctive relief sought. We cannot conclude that the district court abused its discretion in denying leave to amend. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. at 330, 91 S.Ct. 795; *see generally Official*

ABEM certification, it would be appropriate to close the practice track. This suggests that plaintiffs' complaint is not about the qualification restrictions ABEM puts on doctors wishing to sit for its certification examination. It is not even about the propriety of a practice-track option to allow competition with doctors who acquire ABEM certification after residency training. Instead, plaintiffs' case reduces to a dispute about *when* ABEM could retire the practice-track option. But now here in the record do plaintiffs demonstrate that it was premature for ABEM to retire the practice track in 1988 (after giving medical students and doctors eight years' notice), much less do plaintiffs show that they suffered any antitrust injury from closure at this time rather than at some later date that would allow them entry into the purported ABEM cartel.

**23.** *Ertag v. Naples Cmty. Hosp.*, No. 95–3134, slip op. at 2, 121 F.3d 721 (11th Cir. Aug. 1, 1997) (unpublished), an unpublished decision of the Eleventh Circuit relied on extensively by plaintiffs, similarly involves plaintiffs who sought to end the allegedly anticompetitive practice at issue, not to join it.

*Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 168 (2d Cir.2003) (concluding district court did not abuse discretion in denying leave to amend "because there was 'a repeated failure to cure deficiencies by amendments previously allowed' " (citation omitted)). Assuming such an amended claim would state an antitrust injury, as the district court noted, the proposed amendment represented a third change in pleadings over thirteen years of litigation. This raised legitimate concerns as to both undue delay and prejudice because plaintiffs proposed "to change their entire theory of the case" in a way that was unsupported by any expert economic analysis. *Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d at 164; *see Barrows v. Forest Labs., Inc.,* 742 F.2d 54, 58–59 (2d Cir.1984) (upholding district court's denial of leave to amend complaint to effect "a radical shift" in theory of recovery); *cf. Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (recognizing delay and prejudice as grounds for denying leave to amend).

On appeal, plaintiffs submit that the amendment represented only a clarification, not a departure, from their prior theory of antitrust injury. They further submit that the theory is supported by basic economic principles of supply and demand, requiring no expert evidence that their entry into the market would lower prices for consumers. The first argument is belied by the record, which, as we have already discussed, demonstrates that plaintiffs' core complaint was their inability to command the same super-competitive compensation available to ABEM-certified doctors. Indeed, even after plaintiffs proposed to amend their prayer for damages, they offered no modification to their equitable demand. To the extent, then, that plaintiffs continued to seek an injunction requiring a temporary reinstatement of the practice track to allow *them* to enter the alleged cartel, while otherwise preserving its exclusive certification arrangement (and super-competitive remuneration opportunities), there was still reason to question whether they were seeking relief for an antitrust injury even after amendment. As for plaintiffs' second argument, we note simply that the pro-competitive effect for *consumers* of having plaintiffs provide emergency health care at higher rates as ABEM-certified doctors than they had as non-certified practitioners is by no means obvious.[24] Plaintiffs' economic expert con-

---

**24.** For example, if as ABEM diplomates, plaintiffs could, in fact, command $50,000 more in annual remuneration (the difference identified in their complaint between themselves and ABEM-certified counterparts), *see* Second Am. Compl. ¶ 104, then the total cost to consumers (hospitals, patients, and insurers) of emergency medical care would increase, a result of no interest to antitrust law. Even if plaintiffs' entry into the ABEM market resulted in a decrease in the pay presently commanded by certified doctors but an increase in plaintiffs' pay, that would not necessarily translate into a total cost savings for consumers. As the magistrate judge observed with respect to plaintiffs' pleaded theory of injury: "the economic complexities of the health care services market, including a high degree of government regulation and finan-

cial involvement," require "sophisticated economic analysis" to determine if "the normal laws of supply and demand can even be applied" in this case. *Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d at 182–83. The same conclusion applies to plaintiffs' proposed amended theory of injury. Careful economic analysis is necessary to determine the overall competitive effect and consumer benefit from an action that would move a significant number of doctors—namely, the plaintiffs—out of one product market, where physicians not certified by ABEM provide emergency medical care for modest compensation, into another market, where a limited number of ABEM-certified doctors charge significantly higher rates for essentially the same services.

ceded that he had performed *no* analysis of the consumer effect of defendants' purportedly anticompetitive conduct. Plaintiffs attempt to excuse this omission by arguing that the issue had not been the focus of discovery up to that point. Their argument is unconvincing. The fact that plaintiffs had not yet been called upon to provide defendants with that economic analysis in discovery does not explain why, after a decade of litigation, their own expert had not been asked to consider this critical issue. Under these circumstances, we cannot conclude that, the district court abused its discretion in refusing to allow plaintiffs, after more than a decade of litigation, to substitute an untested theory of antitrust injury for one that was deficient as a matter of law.

Because plaintiffs fail to demonstrate the antitrust injury necessary to support standing, there is no point in transferring this case to another district.

### c. *Efficient Enforcers*

 Even if we were to conclude that the plaintiffs had adequately stated an antitrust injury, that would not necessarily establish their standing to sue in this case. "A showing of antitrust injury is necessary, but not always sufficient," to establish standing. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. at 110 n. 5, 107 S.Ct. 484; *accord G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir. 1995). "[O]ther reasons" may sometimes indicate that a party who states an antitrust injury is nevertheless not a proper antitrust plaintiff. *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. at 540–45, 103 S.Ct. 897; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. at 110 n. 5, 107 S.Ct. 484. These other reasons may "prevent the plaintiff from being an efficient enforcer of the antitrust laws." *Balaklaw v. Lovell*, 14

F.3d 793, 798 n. 9 (2d Cir.1994) (citing *Todorov v. DCH Healthcare Auth.*, 921 F.2d at 1449). Among the "other" factors generally considered relevant to standing are

> (1) "the directness or indirectness of the asserted injury"; (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d at 66 (quoting *Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. at 540–45, 103 S.Ct. 897). The extent to which these factors apply when plaintiffs sue for injunctive relief depends on the circumstances of the case. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. at 111 n. 6, 107 S.Ct. 484 (noting with respect to duplicative recoveries that "one injunction is as effective as 100," and "100 injunctions are no more effective than one" (quotation marks and citation omitted)); *see also Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d at 66 ("Some, but not all, of these secondary factors may also limit a plaintiff's right to injunctive relief under § 16 [of the Clayton Act]."). Similarly, the weight to be given the various factors will necessarily vary with the circumstances of particular cases. *See generally Sullivan v. Tagliabue*, 25 F.3d 43, 46 (1st Cir.1994) (noting that the Supreme Court has provided "little guidance as to how to weigh the various factors" relevant to antitrust standing).

In this case, where plaintiffs sue for both money damages and injunctive relief, one factor raises particular standing con-

cerns: the presence of other efficient antitrust enforcers "whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Associated Gen. Contractors of California v. California State Council of Carpenters,* 459 U.S. at 542, 103 S.Ct. 897. In considering this factor, we recognize, as the district court observed, that plaintiffs "have no natural economic self-interest" in reducing the cost of emergency medical care to consumers. *Daniel v. American Bd. of Emergency Med.,* 269 F.Supp.2d at 182. This same concern may frequently arise when competitors sue to vindicate the antitrust laws, without automatically depriving such plaintiffs of antitrust standing. But in this case, the concern is not theoretical. There is a long litigation history in which the relief pursued by plaintiffs has been to gain entry into an exclusive arrangement that they otherwise seek to maintain in order to share in the super-competitive remuneration allegedly made possible by ABEM exclusivity.

While it is questionable whether plaintiffs' damages demand and their particular prayer for injunctive relief would genuinely promote the public interest in antitrust enforcement, no such concern would arise if defendants' actions were challenged by another group of plaintiffs: the health care insurers, including employers and government agencies, who compensate hospitals for most emergency medical care. It would be unrealistic to expect emergency care patients, who can hardly make a deliberate selection of an emergency physician, let alone inquire into the doctor's board certification, to pursue an antitrust action to challenge an artificially inflated compensation rate. As for the hospitals, we recognize that they play a dual role in the alleged scheme. As consumers who purportedly overpaid for emergency medical care, they might be seen as victims of the alleged anticompetitive conduct and potential plaintiffs. On the other hand, as suppliers of residency training in emergency medicine, the hospitals have an alleged interest in limiting ABEM certification to doctors with such training. But private and government health care insurers that routinely reimburse hospitals for millions of dollars in emergency care provided to thousands of covered patients have a direct and undivided economic interest in obtaining lower costs, as well as the legal sophistication and resources necessary to pursue an antitrust challenge. The fact that none has done so to date does not support recognizing plaintiffs' standing. Rather, it reinforces the conclusion that no public interest is sacrificed by dismissing this action for lack of personal jurisdiction and venue without transfer to another district. *See Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. at 542, 103 S.Ct. 897.

### III. *Conclusion*

To summarize, we conclude that the district court could not acquire personal jurisdiction over CORD or the hospital defendants through the service of process provision of Section 12 of the Clayton Act unless venue was established pursuant to that section. Because Section 12 venue did not obtain in this case, the action against CORD and the hospital defendants is properly dismissed for lack of personal jurisdiction. We further conclude that the action against ABEM is properly dismissed for lack of venue because neither Section 12 of the Clayton Act nor 28 U.S.C. § 1391 permits this case to be heard in the Western District of New York. Finally, we conclude that transfer of this case to any other district where jurisdiction and venue might properly be obtained is not in the interest of justice

because plaintiffs lack antitrust standing to pursue this case further.

The June 30, 2003 judgment of the district court dismissing all claims is AFFIRMED.

KATZMANN, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's well-reasoned determinations that personal jurisdiction in the Western District of New York does not exist over CORD and the Hospital Defendants, and that venue in the Western District is not supported for ABEM. I respectfully dissent, however, from the conclusion that transfer to another district is not in the interest of justice because the plaintiffs lack antitrust standing.

I respectfully disagree with the two conclusions underlying the majority's view that the plaintiffs here cannot demonstrate standing: 1) that they have not demonstrated antitrust injury, and 2) that even if they could show antitrust injury, they do not have an adequate self-interest in securing relief to vindicate the public interest in antitrust enforcement.

*Antitrust Injury*

I believe the antitrust injury inquiry is in fact a simple one. The antitrust injury requirement "ensure[s] that 'a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.'" *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 103 (2d Cir.2000) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). Here the allegations in the Second Amended Complaint meet this burden. They state that because the defendants closed the practice track and continue to forbid practice-track physicians from taking the certification exam, the plaintiffs are being "unreasonably restrained from competing in the market" for ABEM-certified emergency physicians, and that as a consequence, the plaintiffs "have been and continue to receive substantially less remuneration than ABEM certified emergency physicians." ¶ 104. These allegations suffice, in my view, to allege losses stemming from a competition-reducing aspect or effect of the defendant's behavior.

Indeed, this case is not unlike other antitrust cases in which courts have held that health care providers alleging harm from anti-competitive practices have demonstrated antitrust standing. In *Brader v. Allegheny General Hospital*, 64 F.3d 869 (3d Cir.1995), a physician claimed that a conspiracy had resulted in the termination of his hospital privileges, and that the loss of these privileges prevented him from obtaining privileges at other hospitals. *Id.* at 871–72. He alleged that this constituted a Sherman Act violation, *id.*, stating that the defendants' actions "prevented the Plaintiff and others from engaging in the practice of general vascular trauma surgery in the relevant market," which "prevented competition in the relevant product market within the relevant geographic market." *Id.* at 875–76. The court concluded that these allegations—which are similar in all important respects to the plaintiffs' allegation here—sufficed to demonstrate antitrust injury. *Id.* at 876–77. *See also Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 272–73 (3rd Cir.1999) (holding that a surgeon-plaintiff who had sued three hospitals for effectively excluding him from staff privileges had shown antitrust injury and antitrust standing).

The majority, however, concludes that the plaintiffs cannot possibly demonstrate antitrust injury because the plaintiffs' "theory of remuneration is not simply that ABEM-certified doctors command super-competitive remuneration; their injury is the inability to do likewise." Majority Op.

at 438. To support the assertion that the plaintiffs seek to earn "super-competitive" wages, the majority makes several assertions about the relief the plaintiffs seek. In my view, these assertions are problematic.

First, the majority contends that the plaintiffs' theory "was not that they were denied the competitive remuneration that the market would have awarded but for domination by the defendants' cartel." Majority Op. at 439. I believe, however, that this statement is belied by the Second Amended Complaint, which states that the plaintiffs have been deprived of the opportunity to "*compete* for the higher salaries paid to ABEM eligible and ABEM certified emergency physicians." ¶ 104 (emphasis added). Because the complaint specifies that the plaintiffs, if they obtain the remedy they seek, will compete with existing ABEM-eligible and ABEM-certified emergency physicians, the complaint makes clear that the plaintiffs do in fact seek the compensation that the market would have awarded them but for domination by the defendants' cartel. True, these salaries will be higher than the plaintiffs' current salaries. However, the plaintiffs' demands are consistent with consumer benefit, in that increased supply could result in lower salaries for ABEM-certified physicians in general, and lower prices for consumers of their services. In the end, if the practice-track exclusion is anti-competitive in violation of the Sherman Act, and plaintiffs are awarded the relief they seek, consumers will have more choices as they seek the highest quality ABEM-certified service at the lowest price—exactly the sort of outcome the Sherman Act is designed to foster. *See Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (stating that the Sherman Act rests on the premise that competition "will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress" and adding that "the policy unequivocally laid down by the Act is competition").

Second, the majority states that the "[p]laintiffs do not ... sue to eliminate the eligibility criteria for ABEM certification that they claim allows defendants to limit market supply." Majority Op. at 440. However, the Second Amended Complaint seeks to have ABEM "permit plaintiffs and the class they represent who, as of the date of judgment herein, or with the passage of time, meet ABEM's practice track criteria ... to take the ABEM certification examination." In my view, this would constitute the elimination of the eligibility criteria that the plaintiffs claim allows the defendants to limit market supply illegally.

Third, the majority states that the plaintiffs "do not seek an injunction allowing any licensed doctor to take the ABEM exam so that all who pass can receive board certification in emergency medicine." Majority Op. at 440. This is true. However, this only means that the plaintiffs will earn "super-competitive" remuneration if one assumes that *all* restrictions on who may take the certification exam are illegally anti-competitive. The plaintiffs do not allege the illegality of restrictions other than the restriction on practice-track physicians. Whether excluding physicians who are neither residency-track nor practice-track physicians is lawful might be the subject of some other litigation brought by some other set of excluded plaintiffs. At this stage of this litigation, however, without further discovery, I believe we must accept not only the plaintiffs' allegations that excluding practice-track physicians is illegally anti-competitive, but also the view—implicit in the complaint—that excluding all physicians other than residency-track physicians and

practice-track physicians is reasonable and not illegal.[25]

Fourth, the majority states that the plaintiffs seek to restore practice-track eligibility only "temporarily." Majority Op. at 440. However, the Second Amended Complaint seeks to have the certification exam open to all class members "who, as of the date of judgment herein, or *with the passage of time,* meet ABEM's practice track criteria." (emphasis added). I believe the complaint thus seeks relief that is by no means temporary. A footnote in the majority opinion suggests that at oral argument plaintiffs' counsel admitted that the sought-after remedy is less than permanent. Majority Op. at 440–41 n. 22. In the relevant portion of the oral argument, counsel was asked whether, because "demand is exceeding supply" in the market for emergency medicine services, the total cost of such services would stay the same, even if relief were granted. **Oral Arg. Recording at 10:55:53.** Counsel responded, in part, that even if demand is currently "exceeding supply," that might change if a court granted the relief the plaintiffs seek, so that supply would increase to fulfill demand, and "have market forces take over entirely." *Id.* at 10:56:10. Later, in response to a follow-up question, counsel stated that once practice-track physicians are permitted to take the certi-

fication exam, and supply has increased, "the violation presumably will have ceased." *Id.* at 10:56:43. I view these responses as simply assuming hypothetically that market forces have taken over and violations have ceased *because* the plaintiffs have obtained the ongoing relief they seek. Neither response indicates a concession "that, at some future point, ... it would be appropriate to close the practice track."

For these reasons, I do not believe that the plaintiffs seek to earn "super-competitive" wages, or any other relief that is inconsistent with their allegations that 1) prohibiting practice-track physicians from taking the certification exam is illegally anti-competitive and 2) the plaintiffs have suffered antitrust injury as a consequence.

Of course, it may be that the plaintiffs are not entitled to relief on the merits. Perhaps the exclusion of practice-track physicians is entirely reasonable because, in fact, its pro-competitive benefits outweigh its anti-competitive effects. For example, perhaps physicians who would qualify for the exam only through practice experience are fundamentally less skilled than those who have completed an approved residency program. These issues, however, are classic "rule of reason" questions, distinct from the antitrust standing question.[26] *See Geneva Pharms. Tech.*

---

**25.** Of course, not all exclusions are violations of the Sherman Act. *See, e.g., White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963) (stating that vertical territorial limitations "may be allowable protections against aggressive competitors or the only practicable means a small company has for breaking into or staying in business" and hence permissible under the antitrust laws); *Angelico,* 184 F.3d at 276 n. 3 (stating in a health care exclusion case that "[g]roup boycotts or concerted refusals to deal are not always per se violations of the Sherman Act; rather, the analysis turns on the facial effects of the challenged practice."); *Retina Assocs., P.A. v. Southern Baptist Hosp.,* 105 F.3d 1376

(11th Cir.1997) (holding that a referral agreement between non-specialized ophthalmologists and a retina specialist, under which the plaintiffs, retina specialists, received virtually no referrals, was neither per se unreasonable nor illegal under the rule of reason analysis).

**26.** Moreover, such questions simply cannot be resolved without significant additional discovery, a fact that the majority opinion seems to acknowledge, when it states that "[c]areful economic analysis is necessary to determine the overall competitive effect and consumer benefit from" permitting non-ABEM-certified emergency medicine physicians to become ABEM-certified. Majority Op. at 442 n. 24.

*Corp. v. Barr Labs., Inc.,* 386 F.3d 485, 506–07 (2d Cir.2004) (summarizing rule of reason analysis); *Angelico,* 184 F.3d at 272–76 (holding that a surgeon-plaintiff who had sued three hospitals for effectively excluding him from staff privileges had antitrust standing, and distinguishing between antitrust standing and anti-competitive market effect under the rule of reason analysis); *Fine v. Barry & Enright Prods.,* 731 F.2d 1394, 1397–99 (9th Cir. 1984) (holding that a plaintiff who was not permitted to be a contestant on a game show because of restrictions on repeat appearances had standing to sue but did not demonstrate sufficient injury to the contestant market under a rule of reason analysis).

The majority relies principally on *Sanjuan v. American Board of Psychiatry and Neurology, Inc.,* 40 F.3d 247 (7th Cir. 1995). I believe *Sanjuan* is fundamentally different from the case before us. In that case, the physician-plaintiffs had failed an oral examination of the American Board of Psychiatry and Neurology. *See id.* at 248. The plaintiffs had neglected to show that their exclusion harmed consumers, instead demonstrating only that it harmed the plaintiffs. *See id.* at 251 (observing that "[i]t is hard to see how the Board's activities could amount to an exercise of market power, which entails cutting back output in the market and thus driving up prices to consumers," and adding that "[w]hen challenged, plaintiffs revealed that they want to show injury to producers"). *Sanjuan* is thus a classic case of alleging harm to competitors, not competition, which, as the majority rightly points out, does not suffice for Sherman Act protection. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) ("The antitrust laws, however, were enacted for 'the protection of competition, not competitors.' ") (quoting *Brown Shoe Co. v. United States,* 370

U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Here, by contrast, the plaintiffs have alleged that the defendants have "severely limit[ed] the output of ABEM certified and ABEM eligible emergency physicians" and that "higher costs of ABEM emergency physicians have been passed on to consumers of ... such services." Second Amended Complaint at ¶¶ 94, 96. Because they have alleged that relevant conduct does in fact harm consumers and not just themselves, I believe the plaintiffs in our case have alleged "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. 690.

The majority also cites to *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438 (11th Cir.1991). I believe this case is also inapposite. In *Todorov,* an appeal from a summary judgment grant, the Eleventh Circuit concluded that if a local hospital granted the plaintiff-physician privileges to administer CT scans, that physician—a neurologist who did not specialize in CT scans—would "administer and interpret CT scans of the head less efficiently than the radiologists," who would "reduce the price of CT scans of the head until [the plaintiff] could no longer participate in the market at a profit." *Id.* at 1453. The plaintiff "eventually would either be driven from the market or reach some agreement with the radiologists to fix prices," an outcome that "would not benefit consumers," and the Seventh Circuit thus affirmed the grant of summary judgment to the defendants for lack of antitrust standing. *Id.* at 1453–55. Here, we consider the antitrust injury question on a motion to dismiss, when only limited discovery has been conducted. In this posture, there is no basis to conclude that 1) if practice-track physicians were permitted to sit for the certification exam, those who passed would provide emergency medicine

services less efficiently than do residency-track physicians; 2) that residency-track physicians would reduce their prices until the practice-track physicians were either driven from the market or agreed to fix prices; and 3) that consumers would not benefit. Consequently, I do not believe *Todorov* affords a basis for concluding that the plaintiffs cannot show antitrust injury.[27]

*Self–Interest in Securing Relief and the* Associated General Contractors *Factors*

Second, the majority concludes that the plaintiffs cannot demonstrate standing based on one of the "other reasons" courts sometimes consider in analyzing antitrust standing. Majority Op. at 443. These additional factors, analyzed once antitrust injury has been demonstrated, were originally identified in *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) and are sometimes referred to collectively as the "efficient enforcer" analysis.

Here, the majority bases its conclusion on just one of the *Associated General Contractors* points: "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement." *Id.* at 542, 103 S.Ct. 897. The majority expresses concern that the plaintiffs have no "natural economic self-interest" in reducing the cost of emergency medical care to consumers. Majority Op. at 444. Of course, it cannot be the case that any plaintiff seeking to increase its income fails the *Associated General Contractors* analysis. Such a rule would essentially prohibit antitrust suits by competitors, which the majority acknowledges is simply not the law. Majority Op. at 439. Rather, the majority rests its holding on a different ground: that health insurers are better suited than the plaintiffs to vindicate the public's interest in lower costs.

In *Associated General Contractors*, the Supreme Court grappled with the problem that a literal reading of section four of the Clayton Act "is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Id.* at 529, 103 S.Ct. 897. As the majority opinion here observes, *Associated General Contractors* concluded that Congress must have intended that litigation under section four of the Clayton Act "would be subject to constraints comparable to well-accepted common-law rules," such as "foreseeability and proximate cause, directness of injury, certainty of damages, and privity of contract." *Id.* at 532–33, 103 S.Ct. 897. To stay faithful to this congressional intent, the Court laid out the factors we now call the "efficient enforcer" analysis to "guide the exercise of judgment" in determining "whether a party injured by an antitrust violation may recover treble damages" under the Clayton Act. *Id.* at 536–37, 103 S.Ct. 897. The *Associated General Contractors* plaintiffs were unions alleging that a multi-employer association and its members coerced third parties and association members into business relationships with non-union firms. *Id.* at 520, 103 S.Ct. 897. Applying the multi-factor analysis, the Court held that these "allegations of conse-

---

**27.** Indeed, at least one commentator has concluded "[t]he Todorov court's approach to antitrust injury was wrong," because the antitrust injury question does not require the involved economic analysis engaged in by *Todorov*, analysis that is more relevant "to anti-trust liability, to causation, and to determining the amount of damages." Ronald W. Davis, *Standing on Shaky Ground: The Strangely Elusive Doctrine of Antitrust Injury*, 70 Antitrust L.J. 697, 750 (2003).

quential harm" were "insufficient as a matter of law." *Id.* at 545, 103 S.Ct. 897.

*Associated General Contractors* offers no guidance as to how many factors must weigh against a plaintiff in order to find that a Clayton Act remedy is precluded, or which factors are the most important. It seems clear, however, that the ultimate purpose of the "efficient enforcer" analysis is not to find the *ideal* plaintiff, nor the most altruistic one, nor the one most grievously injured by the anti-competitive conduct. Rather, the purpose is to ensure that the statute is not read so broadly that any person who has been harmed by anti-competitive conduct, however remotely or indirectly, is granted a right to sue. *See also Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 416–17, 124 S.Ct. 872, 157 L.Ed.2d 823 (Stevens, *J.,* concurring) (observing that the *Associated General Contractors* interpretation of section four was intended to avoid duplicative recoveries and complex apportionment of damages, and stating that this interpretation "has thus adhered to Justice Holmes' observation that the 'general tendency of the law, in regard to damages at least, is not to go beyond the first step'") (quoting *Southern Pacific Co. v. Darnell–Taenzer Lumber Co.,* 245 U.S. 531, 533, 38 S.Ct. 186, 62 L.Ed. 451 (1918)).

I simply do not believe it is necessary, in order to effectuate this purpose, to preclude suit by the plaintiffs in the present case solely because insurance companies appear to have a greater self-interest in vindicating the public interest in antitrust enforcement. In my view, the *Associated General Contractors* issues here are similar to those in *Potters Medical Center v.*

*City Hospital Association,* 800 F.2d 568 (6th Cir.1986), in which the Sixth Circuit considered antitrust claims brought by a small hospital, Potters Medical Center, against the East Liverpool City Hospital, a nearby larger hospital. *Id.* at 570–71. Potters alleged that City Hospital violated the Clayton Act by refusing to grant staff privileges to doctors with privileges at Potters, pressuring doctors with City Hospital privileges not to obtain Potters privileges, and harassing doctors to prevent them from referring patients to Potters. *Id.* at 571. The district court had ruled that the plaintiffs lacked antitrust standing based on a multi-factor test similar to our "efficient enforcer" analysis and derived from *Associated General Contractors. Id.* at 575. The Sixth Circuit reversed, finding that 1) Potters was "clearly a competitor" in the market for inpatient physician services—a fact that weighed *in favor of* standing; 2) Potters's injuries flowed directly from the alleged antitrust violation; 3) damages were somewhat speculative, but not enough to preclude standing; and 4) the risk of duplicative recovery was minimal. *Id.* at 576, 580. It seems that the identical multi-factor analysis would yield the same result in this case. Moreover, presumably, insurance companies would have been as well situated to demand that City Hospital grant staff privileges to Potters physicians as insurers are in our case to demand that the defendants reopen the practice track. This possibility apparently did not trouble the Sixth Circuit.[28]

The majority attempts to differentiate *Potters* by suggesting that the plaintiffs here, unlike those in *Potters,* do not seek to "forbid exclusivity" by trying "to de-

---

**28.** It is worth noting that were we to transfer this case, we would presumably transfer it the Western District of Michigan, where ABEM is located, and where the plaintiffs' applications were denied. Because Michigan is in the Sixth Circuit, if the *Potters* facts relating to antitrust standing are essentially similar to those here, as I believe they are, *Potters* would control.

stroy an anticompetitive arrangement." Majority Op. at 441. However, as noted above, the plaintiffs here seek to forbid the exclusion of practice-track physicians from ABEM certification, which would destroy an allegedly anti-competitive arrangement. True, as the majority points out, their relief would preserve *some* exclusivity for the certification exam. Majority Op. at 442. But again, I believe this only means that the plaintiffs see some restrictions on who may take the exam as reasonable and legal, even though, they contend, prohibiting practice-track physicians from taking the exam is illegally anti-competitive. In the Sixth Circuit case, Potters itself engaged in the common practice of only granting staff privileges to certain physicians, *Potters,* 800 F.2d at 571, but this did not prohibit it from contesting the defendants' allegedly illegally anti-competitive practices.

Thus, I cannot agree with the majority that the plaintiffs lack standing based on the *Associated General Contractors* "efficient enforcer" factors.

*The Competitor/Consumer Baseline and the Likelihood of Success*

I add only one further point concerning antitrust standing. A review of cases and commentaries indicates that courts do indeed dispute the circumstances under which a party that is neither a competitor nor a consumer may demonstrate antitrust injury or satisfy the *Associated General Contractors* analysis. However, I believe there is agreement that competitors and consumers constitute a baseline set of parties that generally *do* meet these tests. *See Illinois ex rel. Ryan v. Brown,* 227 F.3d 1042, 1046 (7th Cir.2000) ("[N]ormally only consumers or competitors have standing ...."); *Carpet Group Int'l v. Oriental Rug Imps. Ass'n,* 227 F.3d 62, 76–77 (3d Cir.2000) ("[G]enerally only competitors and consumers will suffer an-

titrust injury ...."); *Serpa Corp. v. McWane, Inc.,* 199 F.3d 6, 10 (1st Cir. 1999) ("Competitors and consumers in the market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury."); *Fla. Seed v. Monsanto Co.,* 105 F.3d 1372, 1374 (11th Cir.1997) (stating that "[b]asically, a plaintiff must show that it is a customer or competitor in the relevant antitrust market" to show it is an efficient enforcer); *Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1183 (5th Cir.1988) ("Restraint in the market affects consumers and competitors in the market; as such, they are the parties that have standing to sue."); *Gen. Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 809 (8th Cir.1987) ("[S]tanding to sue under the Sherman Act is limited to a consumer or competitor that proximately suffers antitrust injury.") (quotation marks omitted); *Bhan v. NME Hosps., Inc.,* 772 F.2d 1467, 1470 (9th Cir.1985) (stating that the efficient enforcer analysis requires "that the injured party be a participant in the same market as the alleged malefactors"); *see also* C. Douglas Floyd, *Antitrust Victims Without Antitrust Remedies: The Narrowing of Standing in Private Antitrust Actions,* 82 Minn. L.Rev. 1, 2 (1997) (observing that lower federal courts have distilled Supreme Court holdings to the principle that antitrust standing "should be limited, either absolutely or presumptively, to consumers or competitors adversely affected by the defendant's anticompetitive conduct"). In my view, to suggest, as the majority does, that a competitor does *not* have standing if 1) the competitor seeks to earn a higher wage by ending some but not all exclusions from a market, or 2) some other class of competitors or consumers apparently has a greater self-interest in remedying the violation, departs from the mainstream of antitrust standing cases.

452

And, of course, here, we are not even deciding the standing issue conclusively. We need only decide whether the plaintiffs have a likelihood of demonstrating antitrust standing in another district, such that the plaintiffs have not "plainly fail[ed]" to demonstrate a meritorious claim. *Adeleke v. United States*, 355 F.3d 144, 152 (2d Cir.2004); *see also Phillips v. Seiter*, 173 F.3d 609, 611 (7th Cir.1999) (stating that transfer is inappropriate when "the case is a sure loser" after transfer, because transferring would simply "waste the time of another court"). For the reasons described above, I believe that the plaintiffs' chances of success are significantly better than this.

Consequently, although I concur in the jurisdiction and venue analyses, I respectfully dissent from the majority opinion to the extent it refuses to transfer this matter to another district.